Anthony T. LEE, et al., Plaintiffs,

and

United States of America, Plaintiff–Intervenor and Amicus Curiae.

National Educational Association, Inc., Plaintiff–Intervenor

v.

CHAMBERS COUNTY BOARD OF EDUCATION, et al., Defendants,

Lanett City Board of Education, et al., Defendants–Intervenors,

and

City of Valley and Valley City Board of Education, Defendants–Intervenors.

Civ. A. No. 844–E.

United States District Court, M.D. Alabama, E.D.

April 8, 1994.

Solomon Seay, Jr., Montgomery, AL.

J. Richard Cohen, Montgomery, AL.

Janell Byrd, Washington, DC.

Norman J. Chachkin, New York City.

James Turner, Asst. U.S. Atty. Civ. Rights Div. U.S. Dept. of Justice, Washington, DC.

Nathaniel Douglas, Franz Marshall, Sabrina Jenkins, Gary Haugen, Michael Morrow, U.S. Dept. of Justice, Civ. Rights Div., Edu-

cation Opportunities Litigation Div., Washington, DC.

Robert T. Meadows, Opelika, AL, for Chambers Co. Bd. of Educ.

Donald Sweeney, Jr., Eugenia McGill, Birmingham, AL, for Valley City Bd. of Educ.

John Jones, Lanett, AL, for Lanett City Bd. of Educ.

Sydney Smith, Phenix City, AL, for Lanett City Bd. of Educ.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

ALBRITTON, District Judge.

#### I. *Introduction*

The current phase of this case began on June 16, 1992, when the Chambers County Board of Education filed a request for approval by the Court of a proposed amendment to its desegregation plan.

The City of Valley and the Valley City Board of Education (sometimes referred to collectively as "Valley") intervened in this long-standing desegregation case involving the Chambers County Board of Education in order to seek authorization from this court to create and operate a separate city school system within Chambers County, Alabama. *See* Valley's Amended Petition to Intervene. The private Plaintiffs, the United States of America and the Chambers County Board of Education opposed the creation and operation of the requested city system for various reasons. *See* Various responses to Valley's Amended Petition.

The Lanett City Board of Education, which operates the only other public school system in Chambers County, Alabama, also intervened in this case in order to resolve certain questions surrounding its attendance boundaries. *See* Lanett's Petition to Intervene.

This complex, multi-party litigation raises numerous difficult and interrelated issues. The key and initial issue for resolution is the following:

Whether the establishment and operation of a separate school system in the newly incorporated City of Valley would impede progress towards a school system in Chambers County, Alabama that is free from the vestiges of the County's former *de jure* racially dual system.

Other issues relating to this key question, such as the voting rights of persons living within and outside the City of Valley should the City be allowed to operate a separate system, were pretermitted pending the resolution of the central issue.

In addition, the questions originally raised by the Chambers County Board of Education's June 16, 1992 request for approval of its proposed amendment to its desegregation plan have been temporarily resolved by the original parties' interim agreement, approved by this court on July 1, 1993, which both resolves certain issues and also commits the parties to seek to develop an agreed plan to settle the remaining disputed matters.[1]

Finally, issues involving the Lanett City School District and its appropriate boundaries were addressed during the trial, but because the parties were primarily focusing on the matter of whether formation of a separate Valley City School System should be permitted, and also because the resolution of the issues regarding Lanett City is to some degree dependent upon the determination which the court makes on the Valley question, the parties will be given 30 days from the date of issuance of this decision to submit memoranda setting forth their views, in light of the court's ruling, on the matters of the boundaries of the Lanett City School District and inter-district transfers to or from schools in Lanett.

The case was tried before the court without a jury on May 5–10, 1993, and June 28–July 2, 1993. Closing arguments were presented on July 7, 1993. During the trial, the court heard testimony from numerous witnesses and admitted and reviewed numerous documents. Based upon the evidence presented at trial, the court makes the following Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

---

1. As part of that agreement, the Board of Education withdrew its June, 1992 motion without prejudice. Agreed Order, entered July 1, 1993, at 3.

## II. *Findings of Fact*

### A. History

Chambers County, Alabama, is located in east central Alabama along the border between Alabama and Georgia. Interstate 85 runs through the southeast quadrant of the County at roughly a forty-five degree angle. On the southeast side of I-85 lies the City of Valley, Alabama, which was incorporated in 1980. It is bordered by the Chattahoochee River on the east. Lanett, Alabama, lies just north and west of I-85. It is bordered on the east by the Georgia line, West Point, Georgia and the Chattahoochee River. The remainder of the County is rural with the exception of Lafayette, Alabama, which is the county seat and which is located approximately in the middle of the County. *See* Valley's Amended Petition to Intervene.

There have been two separate school systems in Chambers County, Alabama since the turn of the century: a Chambers County school system and a Lanett City school system. 8 Tr. 280 [Riley]; 11 Tr. 2–4 [Bryan].[2]

This school desegregation litigation is an outgrowth of *Lee v. Macon County Board of Education,* 267 F.Supp. 458 (M.D.Ala.) (three-judge court), *aff'd sub nom. Wallace v. United States,* 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967). In that case, a three-judge district court ordered Alabama's local school districts, including Chambers County and Lanett City, to disestablish their racially segregated and discriminatory systems. The districts were ordered to operate under a freedom of choice plan for the 1967–68 school year. *Id.* at 486–88.

In 1969, the three-judge court found that despite making some progress, Chambers County and Lanett City were still operating racially dual school systems. The court required the development and submission by January 15, 1970 of plans designed to dismantle the dual systems, and it requested the assistance of the U.S. Office of Education for this purpose. *Lee v. Macon County*

*Board of Education,* No. 604–E (M.D.Ala. Oct. 23, 1969).

Pursuant to those directions, the federally funded desegregation assistance center at Auburn University helped prepare a plan for the Chambers County school system. 10 Tr. 13, 134–35 [Winecoff]; *Amended Petition to Intervene on Behalf of Valley City Board of Education and City of Valley, Alabama,* filed January 8, 1993, Appendix "H" (hereinafter "1970 Desegregation Plan").

During the 1969–70 school year, immediately preceding preparation of that plan, there were six all-black schools in the Chambers County System: Chambers County Training School in Lafayette, Cusseta Elementary in Cusseta, Drew Junior High School in what is today the City of Lanett (following annexations in the late 1980's), Phillips Junior High in the Five Points area, Plainview Elementary in Plainview, and Rehobeth High School in the Valley area. 1970 Desegregation Plan.

During the 1969–70 school year, two other schools in Chambers County had all-white enrollments (Lafayette–Lanier Elementary and Riverview Elementary in the Valley area), five schools had enrollments more than 90% white (Fairfax Elementary, Huguley Elementary, Shawmut Elementary and Valley High School in the Valley area, and Waverly Elementary), and another school was 88% white (Lafayette Elementary in Lafayette). *Id.*

The racial composition of the Chambers County schools in 1969–70 reflected their racial identities under the dual system. *See Lee v. Macon County Board of Education,* No. 604–E (M.D.Ala. Feb. 12, 1970) (referring to "517 of the [black students] in formerly white schools.")

The plan prepared with the assistance of Auburn University and submitted to the three-judge court in *Lee v. Macon County* by the Chambers County Board of Education

---

**2.** The following conventions are used in referring to transcripts and exhibits:

Transcripts: [Vol.] Tr. [page] (using arabic rather than roman numerals for volume numbers)

Exhibits: P–Ex [number] Private plaintiffs' exhibits

US–Ex [number] United States' exhibits

CC–Ex [number] Chambers County School Board's exhibits

L–Ex [number] Lanett City School Board's exhibits

V–Ex [number] Valley City & Board of Education's exhibits

divided the school system into four geographic areas, within each of which the grade structures of formerly black and white schools would be altered and/or attendance zones redrawn. 1970 Desegregation Plan.

On February 12, 1970, a terminal type desegregation order was entered by the three-judge court. That order included the standard *Singleton*[3] provisions. At that time, a plan was developed to desegregate the County schools which included all the schools in the County other than those in the city of Lanett which were the subject of a separate desegregation order and plan. *See* Court file. Lanett was also the subject of a terminal type desegregation order with its attendance boundaries coterminous with its city limits. 11 Tr. 27 (Bryan).

The three-judge court approved the Auburn University plan based upon its determination that

> it appears to this Court that said plan as filed by the Chambers County Board of Education on January 16, 1970, as hereinafter ordered modified and supplemented, when fully implemented effective not later than the commencement of the 1970–71 school year, will completely and effectively disestablish the dual school system based upon race as operated by said board of education.

*Lee v. Macon County Board of Education,* No. 604–E, Mem. Op. at 2 (M.D.Ala. Feb. 12, 1970).

On June 12, 1970, the *Lee v. Macon* proceedings concerning individual school districts were transferred to Alabama's several federal court districts and divisions by the three-judge court pursuant to 28 U.S.C. § 1404(a), *see Lee v. Macon County Board of Education,* 448 F.2d 746, 748 n. 1 (5th Cir. 1971), and different civil action numbers were assigned to the Lanett and Chambers County cases. Docket Entries.

Since 1970, there has been no determination made by this court (or by the predecessor three-judge court in *Lee v. Macon County*) that the Auburn plan, as implemented, has succeeded in eliminating all vestiges of the former dual system to the extent practicable; the Chambers County Board of Education remains subject to the continuing jurisdiction of this court. See *Lee v. Chambers County Board of Education,* No. 844–E, Mem.Op. at 2 (M.D.Ala. Feb. 16, 1994). Nor has any such determination been made regarding the Lanett City Board of Education.

Prior to the opening of the 1970–71 school year, the Drew school building in the Chambers County system was destroyed by a tornado and its students were reassigned to Huguley Elementary School and Shawmut Elementary School. 1970 Desegregation Plan.

Subsequent to that time, the Chambers County School Board closed the Plainview, Waverly and Cusseta Elementary Schools and reassigned their students to facilities located in Lafayette. P–Ex 62 [Milner deposition, at 267–68].

In 1980, an area of Chambers County south of the City of Lanett became an incorporated city under Alabama law. It was named the City of Valley. 10 Tr. 202 [Hendrix].

The City of Valley includes four communities which were built originally around West Point Pepperell textile mills. Those four communities are Shawmut, Langdale, Fairfax and Riverview. *See* Valley's Amended Petition to Intervene. Lanett also was built originally around West Point Pepperell mills. Its schools began operation in the early 1890's. 11 Tr. 4 (Bryan)

In the late 1980's, the City of Lanett annexed unincorporated areas of the County, north of the City of Valley and Interstate 85, known as West Shawmut and Plant City. 6 Tr. 206 [Riley]. Neither the Lanett City Board of Education nor the Chambers County Board of Education ever requested this court's approval to change the boundaries of their school districts or attendance zones from those established in 1970 when the desegregation orders were entered. Docket Entries.

One of the major reasons for incorporating the new city of Valley in 1980 had been to

---

3. *Singleton v. Jackson Municipal Separate School District,* 419 F.2d 1211 (5th Cir.1969), *rev'd in part on other grounds sub nom Carter v. West Feliciana Parish School Bd.,* 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 530 (1970).

enhance the education of the children in Valley, by taking all appropriate steps, up to and including, if necessary, the formation of a school system separate from that of Chambers County. (1 Tr. 150–151, 213–214.) (V–Ex 12, 13.)

State law in Alabama authorizes cities such as Valley to operate a city school system. (§ 16–11–1, *et seq.*, and § 16–13–199, Code of Alabama (1975); V–Ex 4.) In fact, it appears that § 16–13–199 allows the schools of a municipality such as Valley to remain under control of the county board only by agreement between that board and the municipality's city council expressed in resolutions adopted by and spread upon the minutes of the two authorities. In the absence of such an agreement, this state statute vests control of the schools "of the territory within the municipality" in a city board of education.

A Valley school district was expected to encompass the six schools located within the corporate city limits: Valley High School, Valley Junior High School, Fairfax Elementary, Shawmut Elementary, Lafayette–Lanier (Langdale) Elementary, and Riverview Elementary. (1 Tr. 174.)

No agreement was entered into between Valley and the County Board of Education for the schools located in the City of Valley to remain under control of the county board and on April 10, 1989, the Valley City Council adopted a resolution creating the Valley City Board of Education, in accordance with § 16–11–1, *et seq.*, Code of Alabama (1975). (1 Tr. 157.) (V–Ex 6.) Five members, including one black, were appointed to the city school board by the city council. (1 Tr. 153.) A strong motivating factor in attempting to form a separate school system was a perception among Valley citizens that the Chambers County Board of Education had not conducted business as though it were accountable to the citizens of Valley and had ignored requests to improve the schools in Valley. (*See* V–Ex 67; 1 Tr. 156, 173, 176–177; 2 Tr. 9–149 (Hall) and 3A Tr. 84–150; 3B Tr. 217–308; 4 Tr. 3–144; Vol. V, 4–174 (A. Leak))

After the Valley City Board of Education was appointed, the Board hired a superintendent and a consultant, both of whom attempted to negotiate an agreement with the Chambers County Board of Education through its then superintendent, Jerry Milner, for the transfer of control of the schools in Valley from the county system to the city system. (1 Tr. 157–158, 169, 215–217.) (V–Exs 54, 72.) No agreement was reached.

On April 4, 1990, the Valley board requested State Superintendent of Education, Dr. Wayne Teague, to arbitrate the transfer pursuant to § 16–4–8, Code of Alabama (1975). Dr. Teague directed the Chambers County board to negotiate for the transfer of control of the schools in Valley with representatives of the Valley City Board of Education. (Appendix E, Amended Petition to Intervene.) (V–Ex 54.)

When an agreement still was not reached, Dr. Teague issued a letter on May 9, 1990, detailing the manner in which Chambers County would transfer control of buildings, grounds, equipment, textbooks, materials, and supplies, and confirming Valley's authority over the students within the city limits. Chambers County was advised to allow the students from areas outside the city who had traditionally attended Valley schools to continue to do so, with Valley's agreement. Likewise, the reassignment of personnel, to an extent dependent on the distribution of students, was addressed, as were the subjects of transportation and the potential transfer of buses. Dr. Teague pointed out that he had no authority to decide that the Valley system had no right to exist under state law, and that whether the system would exist under federal law was beyond his control. He specifically made this resolution contingent upon any required Section 5 preclearance by the U.S. Department of Justice and upon modification of the existing terminal desegregation order of this court. (V–Ex 54.)

On May 17, 1990, the Valley City Board of Education filed in this action a pleading entitled *Suggestion of Formation of Municipal School System and Petition for Clarification,* requesting this Court's authorization to operate a school system separate from that of Chambers County and to enroll, in that separate system, pupils residing outside the city limits of the Valley municipality.

On June 11, 1990, plaintiffs moved for a preliminary injunction to enjoin the forma-

tion of a separate City of Valley school system. Docket Entries.

■ On October 12, 1990, pursuant to Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c, the Attorney General of the United States interposed an objection to the establishment of a separate school system in Valley, Alabama. Thereafter, the City of Valley sought reconsideration, which was denied on May 31, 1991. Order of July 11, 1991.[4]

Because the formation and operation of a separate school system had been twice denied pre-clearance by the Department of Justice, the City of Valley's 1990 filing was dismissed until such time as pre-clearance had been obtained and plaintiffs' motion for a preliminary injunction was denied as moot. Order of July 11, 1991.

In August of 1991, Leonard Riley became the Superintendent of the Chambers County Board of Education, having been appointed to fill the unexpired term of the elected Superintendent. 6 Tr. 162–163 (Riley). Riley, who lives in Valley, had served as Principal of Valley High School from 1979 until that time. He earned a B.S. degree from Auburn University, a Masters in Education from Montevallo University, and an AA certification in education administration from Auburn. 6 Tr. 153, 154. While serving as Principal of Valley High School, Riley shared the concerns of other Valley citizens over financial and perceived management difficulties in the school system and supported the creation of a separate Valley system. 7 Tr. 148–49, 8 Tr. 3–7, 149–53 (Riley). He has changed his mind, even though his children attend Valley schools and his wife is employed at Valley High School, and testified that after an analysis of the effect of a split-off on the children remaining in the county system he became convinced that those children would suffer educationally. 7 Tr. 29, 128. He impressed the court as a highly dedicated, experienced, talented and thoroughly competent educator.

When Riley took over, he found a system mired in debt, one which projected a budget shortfall by the end of the fiscal year (September 30, 1991) and one which had all but exhausted its borrowing capacity. 6 Tr. 163–164, 176–177 (Riley). Riley at his first Board meeting suggested, and the Board approved, certain changes designed to save money and put the system on better financial ground. 6 Tr. 165–167 (Riley). Among these changes were the closing of Chambers County High leaving that facility K–8 and transferring those students to Lafayette High, transferring the Five Points High students to Lafayette High, in conjunction with the closing of Five Points Elementary and transferring those students (K–8) to the Five Points High facility, and closing Riverview Elementary and splitting those students between Langdale and Fairfax.

On August 12, 1991, the Chambers County School Board filed a *Petition for Emergency Relief* seeking approval of its plan to close certain facilities and to make improvements and repairs at other schools. According to the *Petition*, these changes were necessitated by serious financial difficulties being experienced by the school system.

Following negotiations among the private plaintiffs, the United States and the Chambers County School Board, the court on September 16, 1991, entered an Agreed Order approving the school closures, grade consolidations and student reassignments proposed by the district "as an interim plan for the 1991–92 school year." That Order also required the Chambers County School Board to "conduct a long-range study of its system" and to "review the attendance zones of all of its schools and make recommendations to desegregate those schools which continue to exist as disproportionately black schools." Agreed Order of September 16, 1991.

On February 14, 1992, the City of Valley and the Valley City Board of Education sought to intervene in this case because of concern that the parties' efforts to develop a new desegregation plan for the Chambers County School System would adversely affect Valley's interest in establishing a separate school system. Valley asserted that it was seeking a second reconsideration of the deni-

---

4. Transfer of control of public schools from an elected county board of education to an appointed city board requires preclearance. *Robinson v.* *Alabama State Dept. of Educ.,* 652 F.Supp. 484, 485–86 (M.D.Ala.1987).

al of pre-clearance. *Motion to Intervene,* filed February 14, 1992.

The Chambers County School Board employed consultants from the University of Alabama to make the long-range study required by the 1991 Agreed Order. The consultants reported, as County officials were aware, that total enrollment within the Chambers County School System had been steadily declining in the last several years and was expected to continue to decline. 7 Tr. 125–26; 8 Tr. 207 [Riley]; V–Ex 75–A at 30; *id.,* Appendix "B" at 169; P–Ex 35, at 1–4 (enrollment declining for at least a decade).

Based upon the report of these consultants (the "Bishop–Cleveland" or "Bishop–Lowe" study), on June 16, 1992 the Board filed a motion requesting that this court approve additional school closings, consolidations, and modifications to student assignment to be completed in several phases. *Chambers County Board of Education's Petition to Amend Desegregation Order,* filed June 16, 1992.

In July of 1992, plaintiffs and the United States submitted responses to this Motion indicating concern about the Board's proposals. Docket Entries.

Because of the need for the parties to conduct discovery in preparation for a hearing concerning the Board's proposals, it was not possible to present the issues raised by the motion and responses to the court for resolution in time to permit implementation in the 1992–93 school year of any changes that might be approved.

On July 27, 1992, pursuant to Section 5 of the Voting Rights Act, the Attorney General granted pre-clearance for the establishment of a Valley City School System. This was done after Valley responded to earlier Justice Department objections by annexing nearby areas of black population concentration, thereby increasing its black population from 17 percent to 27 percent, and by enlarging its city council from five to seven members and changing its method of election from an at-large to a single-member district system. V–Ex 7.

On January 8, 1993, the City of Valley, Alabama and the Valley City Board of Education ("Valley") filed an *Amended Petition to Intervene* in this litigation, again seeking the court's approval for the operation of a separate Valley school system that would encompass the current attendance areas under the 1970 desegregation plan for the schools remaining within its municipal boundaries after the 1991 closing of Riverview Elementary, i.e., Shawmut Elementary, Fairfax Elementary, Langdale Elementary, Valley Junior High School and Valley High School. *Amended Petition to Intervene on Behalf of Valley City Board of Education and City of Valley, Alabama,* filed January 8, 1993.

The current attendance zones for most of the schools Valley wishes to operate as part of its school system, (Valley High School, Valley Junior High School, Shawmut Elementary, and Fairfax Elementary) are not coterminous with the boundaries of the City of Valley but extend to areas now annexed to the City of Lanett and to unincorporated areas of the County. CC–Ex 3–B, 5; P–Ex 23, at 4–5; 3 Tr. 226–28 [A. Leak]; 6 Tr. 193–96 [Riley]; 10 Tr. 85–86 [Winecoff].

On January 29, 1993, this court granted the motion of the Lanett City Board of Education ("Lanett") to intervene as a party to these proceedings

> for the purpose of addressing: (1) issues related to student transfers occurring between Lanett and the Chambers County school systems; (2) issues related to students who live in one school district (either Chambers County or Lanett) but attend school in the other district; and (3) issues related to any annexations involving Chambers County and Lanett City.

Order of January 29, 1993, at 2–3.

On March 24, 1993, pursuant to Fed. R.Civ.P. 24(b), this court granted intervention to the City of Valley and the Valley City Board of Education. Order of March 24, 1993.

The Chambers County Board of Education unanimously opposed the creation and operation of a separate Valley City system. CC–Ex 12; 11 Tr. 98–99 (Newton); 7 Tr. 20 (Riley). The Chambers County Board consists of six members elected from single-member districts. Of the six, five are white and one is black. Three members reside within the city limits of Valley and have

children who attend Valley schools. Two of these members are white and one is black. A fourth white board member's son graduated in 1993. 7 Tr. 17–20 (Riley). The United States and the private Plaintiffs also opposed a separate Valley City school system.

## B. Status of School Desegregation in Chambers County

The schools of Chambers County with their black enrollment percentages from 1969 to 1993 are shown in the following chart (P–Ex 26):

PLAINTIFF'
EXHIBIT
26
TRIAL

CHAMBERS COUNTY SCHOOL DISTRICT – BLACK ENROLLMENT PERCENTAGES 1969-70 THROUGH 1992-93 SCHOOL YEARS

| | 1969 1970 | 1970 1971 | 1971 1972 | 1972 1973 | 1973 1974 | 1974 1975 | 1975 1976 | 1976 1977 | 1977 1978 | 1978 1979 | 1979 1980 | 1980 1981 | 1981 1982 | 1982 1983 | 1983 1984 | 1984 1985 | 1985 1986 | 1986 1987 | 1987 1988 | 1988 1989 | 1989 1990 | 1990 1991 | 1991 1992 | 1992 1993 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Chambers County High School | 32.9 | 48.5 | 50.2 | 48.2 | 48.1 | 47.6 | 50.0 | 47.6 | 47.3 | 48.1 | 50.3 | 47.3 | 48.1 | 50.0 | 49.7 | 47.6 | 46.1 | 41.8 | 44.9 | 43.0 | 49.4 | 57.4 | 59.5 | 64.2 |
| Chambers County Training Sch (Southside) | 100.0 | 79.9 | 84.4 | 81.5 | 82.1 | 79.1 | 76.2 | 75.6 | 80.0 | 83.4 | 81.5 | 60.8 | 80.8 | 83.6 | 87.3 | 88.9 | 89.5 | 87.9 | 88.6 | 90.5 | 90.6 | 90.3 | 92.0 | 91.9 |
| Cusseta School | 100.0 | 73.0 | 68.* | 76.1 | 68.9 | 88.2 | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Drew Jr High School | 100.0 | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Fairfax Elementary School | 1.9 | 31.9 | 30.3 | 29.7 | 34.2 | 36.5 | 35.0 | 38.6 | 37.9 | 37.2 | 38.1 | 39.1 | 43.3 | 43.8 | 43.1 | 40.0 | 38.3 | 37.4 | 36.0 | 34.8 | 35.3 | 39.2 | 34.0 | 30.1 |
| Five Points Elemen School | -- | 80.2 | 86.0 | 86.8 | 85.6 | 85.1 | 85.8 | 84.2 | 81.4 | 75.0 | 77.7 | 78.1 | 77.7 | 76.4 | 77.5 | 76.8 | 77.1 | 75.0 | 77.2 | 79.5 | 70.7 | 73.8 | 76.0 | 77.3 |
| Five Points High School | 38.3 | 76.3 | 81.7 | 84.5 | 84.0 | 88.8 | 90.9 | 91.8 | 92.5 | 85.* | 86.6 | 85.1 | 85.3 | 85.3 | 80.4 | 82.6 | 81.3 | 82.3 | 77.1 | 79.9 | 82.4 | 80.6 | – | – |
| Huguley School | 2.4 | 41.2 | 38.5 | 41.9 | 45.8 | 44.1 | 41.4 | 37.9 | 36.6 | 35.6 | 34.0 | 34.4 | 29.7 | 29.4 | 31.0 | 30.0 | 29.3 | 29.6 | 34.2 | 32.2 | 31.8 | 27.6 | 29.0 | 28.1 |
| Lafayette Elementary School (Eastside) | 11.0 | 76.9 | 77.6 | 76.2 | 81.3 | 95.6 | 76.1 | 69.6 | 70.4 | 73.5 | 75.5 | 73.1 | 79.0 | 79.8 | 85.2 | 84.7 | 88.0 | 67.0 | 85.9 | 90.0 | 91.6 | 89.3 | 91.6 | 89.5 |
| Lafayette High School | 43.5 | 70.5 | 86.0 | 84.9 | 85.6 | 83.9 | 85.0 | 85.3 | 88.4 | 87.3 | 87.7 | 87.4 | 87.2 | 88.1 | 90.5 | 89.6 | 91.0 | 92.4 | 94.5 | 94.0 | 93.4 | 92.3 | 93.0 | 94.6 |
| Lafayette Lanier School (Langua e) | 0.0 | 27.3 | 31.3 | 30.3 | 33.5 | 35.3 | 33.3 | 35.0 | 36.7 | 36.8 | 41.5 | 43.4 | 44.3 | 46.1 | 45.1 | 46.2 | 48.5 | 46.9 | 52.2 | 58.3 | 50.5 | 47.9 | 47.8 | 45.5 |
| Phillips Jr High School | 100.0 | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Plainview School | 100.0 | 93.9 | 91.8 | 98.1 | 98.1 | 97.2 | 98.6 | 100.0 | 100.0 | 99.0 | 96.9 | 100.0 | – | – | – | – | – | – | – | – | – | – | – | – |
| Rehobeth High School (Valley Jr High School) | 100.0 | 34.5 | 35.2 | 33.9 | 32.6 | 35.3 | 35.7 | 40.4 | 40.5 | 42.6 | 39.2 | 39.5 | 43.1 | 41.0 | 38.6 | 42.2 | 41.0 | 43.2 | 42.5 | 37.7 | 37.9 | 37.1 | 33.0 | 40.2 |
| Riverview School | 0.0 | 33.6 | 30.2 | 36.9 | 29.5 | 32.4 | 36.2 | 29.6 | 31.1 | 32.6 | 30.2 | 33.8 | 33.2 | 38.4 | 43.0 | 42.1 | 46.6 | 44.7 | 43.6 | 35.3 | 31.6 | 27.7 | – | – |
| Shawmut School | 2.1 | 34.9 | 36.3 | 33.2 | 32.6 | 42.6 | 42.7 | 46.7 | 48.5 | 47.5 | 44.3 | 43.4 | 43.5 | 45.7 | 48.2 | 47.1 | 46.0 | 41.6 | 42.5 | 40.6 | 39.6 | 35.8 | 36.6 | |
| Valley High School | 2.9 | 36.1 | 34.7 | 31.0 | 31.8 | 28.2 | 31.8 | 31.2 | 35.7 | 37.6 | 40.1 | 38.8 | 37.6 | 40.3 | 43.2 | 41.0 | 41.6 | 42.0 | 42.7 | 45.1 | 45.6 | 45.2 | 42.5 | 46.5 |
| Waverly School | -- | 70.1 | 66.7 | 67.6 | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – |

Source: 1969-1982 - State of Alabama, Department of Education – Annual Report Attendance and Transportation in Public Day Schools of Chambers County
1982-1990 - State of Alabama, Department of Education – Division of Administrative and Financial Services
1990-1991 - Attachment A to Agreed Order dated September 12, 1991
1991-1992 - Pages 4-5 of Chambers County Board of Education's Petition to Amend Desegregation Order dated June 16, 1992
1992-1993 - Chambers County Board of Education 1993 School Survey

Though efforts had been made by the Chambers County Board to desegregate its schools prior to Leonard Riley becoming Superintendent in 1991, full desegregation had not been achieved. For example, when Riley became Superintendent, there were several buses which were not desegregated. 6 Tr. 201 (Riley); 10 Tr. 38–29 (Winecoff). The curricula at Lafayette High, predominately black, and Valley High, predominately white, were different in several respects. 6 Tr. 217–221 (Riley); 10 Tr. 36–37 (Winecoff). The black/white ratio of teachers at certain schools were out-of-line with the system-wide ratios. 6 Tr. 222–223 (Riley). The number of teachers with advanced degrees at certain schools, primarily in Valley, was out-of-line with those in other schools. See Agreed Order filed July 1, 1993, paragraph 4e, pp. 11–12; 10 Tr. 34 (Winecoff). Students were permitted to attend school out-of-zone and out-of-district without objection by the Chambers County Board, and this detracted from the effectiveness of the desegregation plan. See Agreed Order, July 1, 1993, paragraph 3, p. 7; Agreed Order, September 1991; 6 Tr. 208–216 (Riley); CC–Ex 20; 7 Tr. 6–11 (Riley); Order of this court filed February 16, 1994, regarding Roanoke City and Randolph County systems. Student black/white ratios show that schools in the northern part of the County were significantly predominately black whereas schools in the Valley area were predominately white. CC–Ex 1. Finally, facilities were of lesser quality in the County than in the Valley area. See pp. 57–58, V–Ex 1(a); 6 Tr. 232 (Riley); 10 Tr. 37–38 (Winecoff); 6 Tr. 143 (Howard).

Although the evidence shows that Riley and the Chambers County Board have made significant strides in this area since August 1991 when Riley became Superintendent, many deficiencies still exist, and this court

could not find the system unitary were that the issue before it.

During the course of the trial of this case, the Chambers County Board reached a comprehensive agreement with the United States and the private Plaintiffs regarding action to be taken to further efforts to achieve a unitary school system. This agreement was incorporated into an Agreed Order entered on July 1, 1993. It addressed matters of concern in all aspects of desegregation, including student assignment, bus routes, facilities and equipment, faculty and staff, curriculum, extracurricular activities, gifted program, majority-to-minority transfers, and long-range planning. Among other things, the Board agreed to support the creation of a single consolidated high school for the County.

Thus, extensive cooperative efforts are now underway aimed at ultimately achieving a unitary school system in Chambers County.

## C. The Proposed Valley City School System

Arnold Leak is chief spokesman for the City of Valley and the Valley City Board of Education in connection with its proposed formation of a Valley school system. Leak is chairman of the City of Valley Education Advisory Committee and is a member of the Valley City Council. (2 Tr. 90–91.)

Leak is a life-long citizen of the Valley area and a graduate of Valley High School. He earned a B.S. degree in industrial engineering from Auburn University (3A Tr. 85) and is employed by West Point Pepperell. He first became involved in efforts to establish a city school system in 1990 (3A Tr. 141) and since that time has devoted thousands of volunteer hours on the project (3A Tr. 91), including extensive reading, study of education matters, and attendance at seminars sponsored by the U.S. Department of Education's America 2000 Program. 5 Tr. 99. Though not a professional educator, Leak impressed the court as being knowledgeable about theories of education and as a very talented man, sincerely dedicated to improving the quality of education in Valley and to doing so through a fully integrated public school system in the city.

Historically, there was tension between the Valley area and the rest of the County. P–Ex 62 [Milner deposition, at 55]; 1 Tr. 12–13 [D. Leak]; 8 Tr. 147–49 [Riley].

During the 1970's and 1980's, however, the Chambers County school district was also beset with a series of financial and management difficulties that were a cause of great concern, especially among officials and citizens in the Valley area. Valley's witnesses cited these problems as one of the major justifications for creating a separate school district. *E.g.*, 1 Tr. 151, 176–77 [Fuller]; 2 Tr. 25–26, 76–78 [Hall].

Indeed, as noted earlier, in the 1980's the current Chambers County Superintendent of Schools, Leonard Riley, who was then serving as Principal of Valley High School, shared these concerns and believed that they justified creating a separate Valley system. 7 Tr. 148–49, 8 Tr. 3–7, 149–53 [Riley].

For example, until 1970 the County levied a five-mill property tax for capital expenditures; however, referenda to extend that levy were defeated in 1969 and 1974, resulting in deterioration of physical facilities and strain on operating budgets. Until passage of a one-cent sales tax earmarked for specific projects in 1992, the system had no capital outlay funds for new construction and could only respond to crises. P–Ex 29, 30, 30a, 62 [Milner deposition, at 376]; 8 Tr. 219–20 [Riley]; V–Ex 57, at 1–2 [Doss Leak 1985 report to County Commission]; *id.* at 10 [1984–85 construction at Huguley and Valley High paid for out of operating revenues].

These difficulties were compounded by a decision of the West Point Pepperell corporation to phase out its longstanding practice of making annual contributions to the Chambers County school system, and by proration of appropriations at the state level. P–Ex 25; V–Ex 57, at 2; 7 Tr. 148, 8 Tr. 220–22 [Riley].

The school district was penalized substantial sums by the State of Alabama for operating at a deficit. V–Ex 73 [Milner deposition, at 151–55]; V–Ex 57, at 11; 8 Tr. 131–32, 145 [Riley].

These deficits resulted in part from management decisions to operate small schools requiring extra teachers for whom the school district did not receive state funding, from an

increase in the size of the central office staff, and from salary increases. V–Ex 57, at 4–10 [Doss Leak report to County Commission].

Valley's witnesses attribute such management decisions in part to the fact that the County Superintendent is elected rather than appointed. *E.g.,* 1 Tr. 151, 185–86, 206 [Fuller]; *see also* V–Ex 57 [Milner deposition, at 576: he had no plans to consolidate the small county high schools because of the political unpopularity of such a move].

However, Leonard Riley, the current Chambers County Superintendent, has addressed the fiscal and management problems, consolidated or closed schools, reduced the number of staff, and substantially improved the financial position of the district. For example, the system has not operated at a deficit since he assumed office. Valley's witnesses expressed satisfaction and praise for his achievements, while noting their concern about past turnover in this elected position. 1 Tr. 176–77, 203–04 [Fuller]; 2 Tr. 92–95 [Hall]; 4 Tr. 114, 5 Tr. 132–34, 6 Tr. 162–78, 7 Tr. 62–66, 144–47, 9 Tr. 3, 24 [Riley]; 10 Tr. 147–49 [Winecoff].

Riley has also supported, and the Chambers County Board of Education has endorsed, a change to appointment rather than election of the school superintendent in the county; such a measure will be placed on the ballot in the next general election. CC–Ex 11; 1 Tr. 208–09 [Fuller]; 7 Tr. 25–27 [Riley].

Another reason articulated for Valley's desire to form its own school district concerns an expectation that many Valley citizens apparently had in the early 1980's about the construction of a new Valley High School. *E.g.,* 1 Tr. 151, 177 [Fuller].

Because of crowding, the school system between 1976 and 1980 considered building a new Valley High School but had no capital outlay funds and was running deficits. V–Ex 73 [Milner deposition, at 494–503]; V–Ex 57, at 1–2.

In 1979, a five-year one-cent sales tax for educational purposes was passed by the voters in the county. In the 1980 election campaign, the successful candidate (Melvin Fet-

ner) said that if he were elected he would build a new Valley High School. By the end of his term, however, the county school system was facing a $750,000 deficit. P–Ex 62 [Milner deposition, at 22–23]; V–Ex 57, at 11 [Doss Leak report to County Commission].

In 1984 the voters passed a 30–year extension of the one-cent sales tax. Valley residents thought that this would assure funding for construction of a new high school. Former Chambers County Superintendent Jerry Milner, who chaired a committee campaigning for approval of the extension, however, never heard or read of any promise by the Superintendent or Chambers County Board of Education to utilize the revenues for this purpose. P–Ex 62 [Milner deposition, at 21, 515], 1 Tr. 177 [Fuller], 2 Tr. 25 [Hall].

No written documentation of any such commitment was produced by Valley, nor was any witness (with the exception of the comments of Mr. Milner cited above) specific about the circumstances of any such promise. *Cf.* 1 Tr. 36–37, 84 [D. Leak].

Around the time of the passage of the 30–year tax in 1984, there were plans announced to build two new high schools, one in Valley and one in Lafayette. 8 Tr. 222–23 [Riley]. Thus, people in the County also had reason to be upset about not getting a new high school. *Id.*

Valley has now requested authority to create and operate a separate city school system. Its officials have agreed to abide by any orders of this court which are designed to assure that such a system will not impede the desegregation process in Chambers County. Valley has also committed itself to operating a totally integrated system and points out that it would have a unique opportunity to engineer a system through the use of the *Green* [5] factors. 2 Tr. 295–296 (Freeman). There have been a number of options presented to this Court by Valley, all of which present various ways of operating a separate city system. For example, one proposal would allow such a proposed system to operate with the presently existing attendance zones while another would confine the

5. *Green v. County School Board of New Kent County, Va.,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

proposed system to the City limits. There are also variations on these two options. V–Ex. 1B.

The option preferred by Valley is Option 1. V–Ex. 1B, p. 2, paragraph 3, V–Ex. 2. Option 1 would preserve the current attendance zones.

In 1990, five elementary schools fed into the Valley Junior High School and the Valley High School, including four within the city limits of Valley (Fairfax, Langdale, Riverview and Shawmut) and one outside the Valley city limits, across I–85 in Chambers County (Huguley Elementary School). Riverview Elementary School has since been closed by the Chambers County Board of Education, with the approval of this Court. (V–Ex. 1(a).)

Valley Junior High School and Valley High School are the closest secondary schools for Huguley students to attend. Many families in Huguley have young children attending Huguley Elementary and older children attending Valley Junior High or Valley High School. (2 Tr, 9–149)

Six hundred eighty-one (681) students who reside outside the city limits of Valley within Chambers County attend school within the city limits of Valley. (V–Ex. 1(a); Testimony of Arnold Leak, Vol. 3A–5, Vol. 11.)

Three hundred ninety-two (392) students are enrolled in Huguley Elementary and would eventually feed into Valley Junior High School and Valley High School under the present desegregation plan. (V–Ex. 1(a); Testimony of Arnold Leak, Vol. 3A–5, Vol. 11.)

The Chambers County Board of Education currently provides transportation to students who live outside the Valley city limits in the county and attend school in Valley, pursuant to the present desegregation plan. (1 Tr. 190.)

The total student population for each Valley school for the 1992–93 school year is as follows:

| School | Total Student Population | Reference |
|---|---|---|
| Fairfax Elementary | 528 | V–Ex. 1(a), p. 23 |
| Shawmut Elementary | 224 | V–Ex. 1(a), p. 26 |
| Langdale Elementary | 326 | V–Ex. 1(a), pp. 29, 41 |
| Valley Junior High | 469 | V–Ex. 1(a), p. 32 |
| Valley High School | 767 | V–Ex. 1(a), p. 36 |

The total number and percentages of black and white students for each Valley school for the 1992–93 school year are as follows:

| School | No. Black | % Black | No. White | % White |
|---|---|---|---|---|
| Fairfax Elementary * | 161 | 30.5% | 367 | 69.5% |
| Shawmut Elementary * | 81 | 36.2% | 143 | 63.8% |
| Langdale Elementary * | 148 | 45.4% | 178 | 54.6% |
| Valley Junior High * | 188 | 40.1% | 281 | 59.9% |
| Valley High School * | 325 | 42.4% | 442 | 57.6% |

( *Same references as above.)

The total faculty population for each Valley school for the 1992–93 school year is as follows:

| School | Total Faculty Population | Reference |
|---|---|---|
| Fairfax Elementary | 31 | V–Ex. 1(a), p. 24 |
| Shawmut Elementary | 19 | V–Ex. 1(a), p. 27 |
| Langdale Elementary | 20 | V–Ex. 1(a), p. 30 |
| Valley Junior High | 26 | V–Ex. 1(a), p. 33 |
| Valley High School | 44 | V–Ex. 1(a), p. 37 |

The total number and percentages of black and white faculty for each Valley school for the 1992–93 school year are as follows:

| School | No. Black | % Black | No. White | % White |
|---|---|---|---|---|
| Fairfax Elementary * | 8 | 25.8% | 23 | 74.2% |
| Shawmut Elementary * | 6 | 31.6% | 13 | 68.4% |
| Langdale Elementary * | 6 | 30.0% | 14 | 70.0% |
| Valley Junior High * | 8 | 30.8% | 18 | 69.2% |
| Valley High School * | 11 | 25.0% | 33 | 75.0% |

(* Same references as above.)

---

The total number of students in all of the five Valley schools is 2,314, with a total black/white ratio of 39%/61%. (V–Ex. 1(a), p. 38.)

The total number of students in the remaining Chambers County schools is 1,971, with a total black/white ratio of 76.2%/23.8%. (V–Ex. 1(a), p. 38.)

The total number of students in the entire Chambers County system, combining Valley and the remaining Chambers County schools, is 4,285, with a total black/white ratio of 56.1%/43.9%. (V–Ex. 1(a), p. 38.)

The total number of faculty in all of the five Valley schools is 140, with a total black/white ratio of 27.9%/72.1%. (V–Ex. 1(a), p. 39.)

The total number of faculty in the remaining Chambers County schools is 128, with a total black/white ratio of 31.2%/68.8%. (V–Ex. 1(a), p. 39.)

The total number of faculty in Chambers County, combined Valley and the remaining Chambers County schools, is 268, with a total black/white ratio of 29.5%/70.5%. (V–Ex. 1(a), p. 39.)

The average percentage of black student enrollment among the Valley schools is 39% (Valley Ex. 1(a), p. 42), which is close/proportional to the county-wide minority population of 35.9%. (V–Ex. 1(a), p. 6.) Within Valley, the proportion of black students to white students ranges from a low of only 30.5% at Fairfax to a high of 43.4% at Valley High. (V–Ex. 1(a), p. 42.) The actual Valley city black population amounts to a lesser percentage of the total city population than the black school population percentage does of the total school population.

While Option 1 would allow students who reside outside the city limits to attend school inside the city, as they are doing now, their parents would have no vote for the school board members if elected nor any vote for the council members who would decide on appointed members. 4 Tr. 134 (Leak). This option would divide assets based on the percentages of students. V–Ex. 1B, p. 2.

Valley has presented no definitive plan as to how such things as bus transportation or voting for board members by non-residents of the city would be handled under this plan, taking the position that such things can be negotiated between the two systems or should be decided by this court. 4 Tr. 111, 134 (A. Leak).

Valley's position is that Option 1 would leave intact the present attendance zones, cause the least student disruption, allow children to attend schools they or their parents have historically attended and effect no changes in the remaining schools. 4 Tr. 78, 112 (Leak); 2 Tr. 21, 30–31 (Hall).

Arnold Leak, Valley's spokesman on the school issue, testified that he would not recommend Options 2, 3, 4, 5, or 6 because of the student disruption. 4 Tr. 99 (Leak); 2 Tr. 30–31 (Hall).

### D. Effect of Valley Plan on County Schools [6]

■ The Court was presented with a considerable amount of testimony and exhibits about the effect of permitting Valley to form a school district separate from the balance of Chambers County. This evidence focused in particular upon two areas: impact on the desegregation process and impact upon the financing of public education in the successor Chambers County district.

*Impact on Desegregation*

The City of Valley has requested that the Court approve its existence as a separate system operating the school facilities located within its corporate boundaries but serving students living in those schools' current attendance boundaries, *i.e.*, students residing outside the city limits. 3–B Tr. 226–27 [A. Leak].

Superintendent Riley testified that he was unaware of any authorization under Alabama law for a city school system to include territory beyond the city limits. 8 Tr. 212 [Riley]. The court finds no such authorization, other than through a court-ordered desegregation plan.

The creation of a separate Valley city system maintaining the present attendance zones would leave a County system consisting of 1,969 students, 1,511 or 77% of whom would be black. CC–Ex 1, p. 3.

Of the schools remaining in the County system, Huguley (K–6) would be 28% black, Chambers County High School (K–8) would be 64% black, Five Points Elementary (K–8) would be 77% black, Eastside (K–3) would be 89% black, Southside (4–8) would be 92% black, and Lafayette High (9–12) would be 94% black. 6 Tr. 180–185 (Riley); CC–Ex 1, p. 3. All of these schools would be substantially predominately black with the exception of Huguley which is located in the southern part of the County and whose students now attend and would attend under Valley's proposal Valley City Schools after completing the 6th grade. CC–Ex 1.

The remaining County schools would also have a substantial number of students who would receive free and reduced lunches. 6 Tr. 205 (Riley); CC–Ex 2. Those in the County who receive free and reduced lunches would exceed those in the City schools. Specifically, 79% of the County students are eligible for free or reduced lunches which means they are at or below the poverty level whereas only 39% of the City students are eligible for free or reduced lunches. CC–Ex 2.

Determining the precise racial characteristics of separate Valley and Chambers County school systems should Valley's request be granted is complicated by a number of factors: First, Valley apparently proposes to permit students in grades 7–12 who reside within the current Huguley Elementary School attendance boundaries to choose whether to attend the Valley system or the Chambers County system. 3–B Tr. 227 [A. Leak]; *but cf.* 5 Tr. 63 [A. Leak: option in Huguley area would cause confusion].

---

**6.** Several witnesses called by the private Plaintiffs testified concerning the issue of racial motivation or discriminatory intent in the creation of the City of Valley and in the establishment of a separate school system. The Court has considered that testimony but chooses to make no findings on that issue since effect and impact rather than intent is the critical inquiry under these circumstances. *Wright v. Council of City of Emporia,* 407 U.S. 451, 462, 92 S.Ct. 2196, 2203, 33 L.Ed.2d 51 (1972); *United States v. Scotland Neck City Bd. of Educ.,* 407 U.S. 484, 489–90, 92 S.Ct. 2214, 2217–18, 33 L.Ed.2d 75 (1972); *Ross v. Houston Indep. Sch. Dist.,* 559 F.2d 937, 942 (5th Cir.1977). The court does note that the evidence shows no racial motivation on the part

of Arnold or Doss Leak, Rodney Fuller or Bobby Crowder. The court further notes, however, that considering all the evidence there is ample justification for Plaintiffs' contention that a reasonable perception has been created in the African–American community in the county that racial considerations were a factor in the decision to create a separate school system in Valley. Plaintiffs contend that, because of this perception, formation of the separate system will convey a sense of exclusion to the African–American community in Chambers County. They point out that this is the purpose of this evidence, not an effort to prove actual intent. The court, however, does not base its decision on any such perception.

In the 1992–93 school year, 497 students residing in Chambers County outside the city limits of Valley and outside the city limits of Lanett (as expanded by the Plant City and West Shawmut annexations) were enrolled in schools within Valley. Of these, 141 pupils attended Fairfax Elementary and the remaining 356 attended Valley Junior High School and Valley Senior High School. 8 Tr. 217–18 [Riley].

Of these 356 pupils, according to calculations made by Valley, there are a total of 234 pupils in grades 7–12 residing in the Huguley attendance area, of whom 57 are black and 179 are white. V–Ex 1–B, at Tabs 1, 2, 3.

If these pupils exercised the option that Valley proposes to afford them along racial lines in a manner that decreased, rather than increased, desegregation, the white enrollment proportions within the City system would increase to 62% white and the county system (including Huguley Elementary School) would become 78% black. V–Ex 1–B, at Tabs 1, 2, 3; CC–Ex 1.

If Valley intends to offer a similar option to other students residing outside the city limits but within the current Valley Junior–Valley Senior High School attendance zone, such as those pupils in the Fairfax Elementary School zone outside the city, the disparity in racial composition between the two systems would become even sharper. As noted, with the exception of the Huguley Elementary School, all of the facilities located within Valley currently have majority-white enrollments and all of the facilities that would remain in the County system should Valley's request be granted have heavily black enrollments. CC–Ex 1; 6 Tr. 182–84 [Riley].

In addition to these uncertainties, enrollments will be affected by the Court's determination with respect to the cross-district attendance of Lanett residents. Students formerly residing within Chambers County, in areas annexed to Lanett in 1988, currently attend either schools in Lanett or in Chambers County pursuant to an informal, unwritten agreement between the Superintendents of the two systems. 8 Tr. 250–53, 260–65 [Riley]; 11 Tr. 21–25, 41–42 [Bryan]. These arrangements have never been formalized or submitted for this Court's approval.

In 1992–93, 225 black and 16 white students residing in areas annexed to Lanett attended Chambers County schools; all but one black student attended schools located within the Valley city limits or Huguley Elementary School. CC–Ex 2; 6 Tr. 207 [Riley].

Also in 1992–93, 151 black students residing in the West Shawmut area annexed to Lanett attended Lanett City schools, while 157 white and 32 black students residing within Chambers County in areas *not* annexed to Lanett were enrolled in Lanett City schools. L–Ex 2; 6 Tr. 207–08 [Riley].

Dependent upon what determinations are made with respect to the ultimate attendance of these pupils consistent with the Orders in this action, the disparity in racial composition between the new Valley district and the remaining Chambers County system could either increase or decrease to some degree. *E.g.,* 5 Tr. 153 [A. Leak: if white students from Valley area who currently attend Lanett schools had to return to Valley, it would not help integration].

Under the best of circumstances, the population of the district that will remain if Valley is allowed to withdraw from the Chambers County system will be small, rural, and about 77% black. Approximately 75% of its students would qualify for free or reduced-price lunches because of low family income. 8 Tr. 259 [Riley]. Riley admitted that if the split-off occurs, he would be interested in moving to a larger and better desegregated district. *Id.* at 260 [Riley].

Approving a new Valley system based on attendance zones extending outside the city limits, whether such zones be those currently in place or modified zones, would create an artificial situation dependent upon continuation of court orders and supervision, rather than a move toward the establishment of a system with prospects of being declared unitary. This is because the City would have no obligation to accept students from outside its city limits in the absence of a continuing court order.

Granting Valley's request also would impede or prevent the construction or operation of a single, consolidated high school for all

students in the current Chambers County system, a measure to which the existing Chambers County Board of Education has committed itself, which this Court has approved for implementation should it determine not to permit the creation of a separate Valley system at this time, and one which would insure complete desegregation of the public schools in the county at the high school grade level.

The need to provide new high school facilities in Chambers County has long been recognized and is acknowledged by all parties. In the mid–1980's, the system considered building two new high schools in the county. V–Ex 73 [Milner deposition, at 496]; 8 Tr. 222–23 [Riley]. Superintendent Riley believes that both Lafayette and Valley High Schools need to be replaced. 8 Tr. 222–23 [Riley]; see also 10 Tr. 46–47 [Winecoff].

The City of Valley's plans for its new school system include new facilities for both the Valley Junior and Valley Senior High Schools, which Dr. Hall testified were needed. V–Ex 2, at 7;[7] 5 Tr. 38 [A. Leak]; 2 Tr. 46 [Hall]; see also V–Ex 75–A (the Bishop–Cleveland study) (Options 6 & 7).

Experts for the City of Valley and the United States agreed that the optimum size for a high school is between 1200 and 1600 students, see 2 Tr. 66 [Hall]; 10 Tr. 29–30 [Winecoff].

Because of its small size (fewer than 500 students), it is especially difficult for Lafayette High School to offer a comprehensive curriculum. 10 Tr. 36–37 [Winecoff]. Valley High School, which has approximately 750 students, can offer somewhat more than Lafayette High School but is still limited in some ways by its size. Id.

The benefits of operating a consolidated high school would be substantial: better desegregation than currently exists at the high school level, 7 Tr. 123, 9 Tr. 7–8 [Riley]; 10 Tr. 26–29 [Winecoff]; a wider range of curricular offerings, 8 Tr. 30 [Riley]; 9 Tr. 75–76 [Fannings]; 10 Tr. 26–29 [Winecoff: large enough teaching staff to offer diverse programs]; elimination of curriculum disparities, 8 Tr. 30 [Riley]; 9 Tr. 66–67, 75 [Fannings]; more efficient use of resources, 7 Tr. 124–25,

8 Tr. 32–33, 223 [Riley: County cannot afford to build two high schools]; adequate resources to provide up-to-date educational program and extra-curricular activities. Id. Dr. Winecoff also believes that a comprehensive, consolidated high school would help attract white students back to the school system. 10 Tr. 51–52 [Winecoff].

The Alabama State Board of Education has urged local school boards "to seriously consider merger and/or consolidation as a viable option when the decision regarding the improvement of educational services and the wise use of resources are being made." CC–Ex 10; 9 Tr. 17 [Riley].

Although a consolidated school proposal is always an emotional issue for any community, Superintendent Riley believes that there would be significant support for this plan in Chambers County once a comprehensive plan is presented, demonstrating how the quality of education would be enhanced. 7 Tr. 124, 9 Tr. 14, 16 [Riley]. Dr. Winecoff agreed. 10 Tr. 50–51.

There is some evidence to support Riley's expectation. Even before development of the current proposal, the Bishop–Cleveland study team reported that 40% of the teachers at Valley High School responding to a survey agreed with the concept of a consolidated high school, and 51% of the responding parents of students attending Lafayette High School supported a consolidated high school in Chambers County; the students themselves agreed. 9 Tr. 12–15, 51 [Riley].

As plaintiffs' witness George Fannings noted, at one time he had opposed the idea of a consolidated high school, but he now supports it, having seen the benefits of consolidation first-hand when his son was reassigned to Lafayette High School at the time the very small Five Points High School was closed in 1991. 9 Tr. 75–76 [Fannings].

The court has already concluded that the Chambers County Board of Education has not fulfilled its constitutional obligation to eliminate all vestiges of the former dual system to the extent practicable.

---

7. Contrary to the reference in V–Ex 2 at 7, the identified site is outside the current Valley City limits and voting district 6 in Valley. 3B Tr. 236, 237; 5 Tr. 38 [A. Leak].

Based upon all of the evidence described above, the Court now finds that establishing a separate system in Valley predicated upon maintenance of existing school attendance boundaries will interfere with the implementation of further measures designed to eliminate racially identifiable schools in Chambers County, to the extent practicable.

*Financial Impact*

The Court also received substantial evidence and testimony concerning the financial and educational viability of the surviving Chambers County school system if Valley is allowed to operate as a separate district; that is, concerning the fiscal and other resources that will be available to the county district and the scope and quality of educational program that the district is likely to be able to provide with those resources.

This evidence involves the highly complex Alabama system of school financing. 3–A Tr. 49 (McClain).

Although in Alabama much of the revenues for public education come from the state government, 3–A Tr. 18 (McClain), not all of these funds are distributed on the basis of a uniform measure such as ADA (average daily attendance). 3–A Tr. 40, 50–51 (McClain: state transportation aid, teachers' pension contributions, for example, not based on ADA; more than 25% of state funds distributed on basis other than ADA).

State funding is intended to provide support for only a minimal level of educational offerings, not an adequate education. 3–B Tr. 207–09 [Teague]. Locally raised funding to supplement what is available from state sources is the key to educational quality. *Id.;* 3–A Tr. 36, 61 [McClain]; 9 Tr. 102 [Leslie].

In fact, state aid is by itself insufficient to meet the entire cost of providing an education of even minimal quality; school districts must raise additional local revenues for education in order to qualify for state aid. 3–A Tr. 51–52, 55–56 [McClain].

The Alabama Legislature has also, through the Smith Act, imposed limitations on class sizes in the early grades that require most systems to raise and expend additional local revenues because the state aid they receive does not cover the costs of compliance with this law. 3–A Tr. 60–61 [McClain]; 7 Tr. 102 [Riley].

Valley does not disagree with the general principle that local funding is the key to the level and quality of educational offering that a system can provide; rather, it takes the position that adequate revenue-generating opportunities to support a high-quality educational program will be available to the surviving Chambers County district even after Valley's formation and operation. *E.g.,* 4 Tr. 4, 10–11 [A. Leak: potential increases in property tax].

However, Valley officials did no comprehensive study of the financial impact on the Chambers County system of operating a separate district comprising the current Valley Jr./Sr. high school attendance area. 5 Tr. 14 [A. Leak].

Prior to Valley's decision to form its own school system, it retained a consultant (Dr. B.D. Whetstone) to examine the feasibility of such a step. In January of 1988, Dr. Whetstone submitted a report to the Valley City Council, *A Study to Determine the Feasibility of Forming a City School System in Valley, Alabama.* V–Ex 37.

Dr. Whetstone noted several advantages to a separate system: greater community support, appointed school board, better financial support, and the unique authority of cities to raise revenue. *Id.* at 26–27. The disadvantages of operating a city system included additional administrative costs, the concern "that smaller school systems tend to provide limited student services because a small student population tends to dilute the State and federal funding sources," the fact that operation of a city system usually puts the county system at a financial disadvantage, and the lack of electoral power afforded persons living in unincorporated areas assigned to city schools. *See id.* at 28.

Dr. Whetstone recommended that "[t]he effects on the County as a whole should be analyzed carefully to avoid undue political and financial stress which may result from the transition." *Id.* at 32.

Valley's witnesses, however, admitted that they did not examine the impact of separation on the surviving County system. 1 Tr.

69 [D. Leak]; 1 Tr. 172–73 [Fuller]; 1 Tr. 229–30 [Crowder]; 2 Tr. 67–69 [Hall].[8]

Valley officials did not, for example, analyze the distribution in the two proposed school systems of children having special educational needs, although its financial expert witness Dr. Darrell McClain admitted that in general, rural districts have proportionately more high-cost special education students than urban districts. 3–A Tr. 62–63 [McClain]; 5 Tr. 129–31 [A. Leak].

The cost of special education programs is not fully funded from state or federal sources outside local revenues, and local costs for these programs can be a substantial burden. 3–A Tr. 674 [McClain].

A larger share of the existing county district's special education population resides in areas outside the proposed Valley system than within it. CC–Ex 2, at 6 [13.2% of enrollment in surviving county system; 11.7% of enrollment in Valley]; 7 Tr. 46–47 [Riley]; 9 Tr. 108–09 [Leslie]; see US–Ex 44, at 5; cf. 10 Tr. 39–40 [Winecoff: county system will have twice the proportion of students from families below poverty line, who have special needs and require special programs, as Valley]; CC–Ex 2 at 6 [65% of students in county system eligible for free lunches compared to 30% in Valley].

If the court permits the Valley district to operate, the Chambers County district would have to equip and operate special education programs now offered only at schools in the Valley area, such as the pre-school handicapped student program at Fairfax Elementary School and the gifted student program at Fairfax Elementary School. 8 Tr. 186–94 [Riley].

The only budget estimates that Valley prepared for its school system were based upon determining the proportion of current Chambers County School District students who would be assigned to schools in the new system Valley proposes to create (54%) and multiplying each item in the current year's statement of revenues and expenditures for the existing county district by that ratio; Valley officials made no estimate of special needs each system would be required to address, etc. 3–B Tr. 216–19, 5 Tr. 11–12, 129–31 [A. Leak].

More refined calculations made by Superintendent Riley demonstrate that this simple proportional approach does not furnish an accurate projection of the actual costs to each system of maintaining the *status quo; i.e.,* the level of educational offering currently available in the single county district. *E.g.,* 7 Tr. 40 [Riley: application of state formulas to each category of item more accurate than straight proportional approach]; *id.* at 46–47 [Riley: he requested weighted special education counts for Valley and surviving county district from the State Department of Education].

*Expenditures*

Riley's estimates of General Fund expenditures [9] that will be required to maintain the existing educational program in each of the successor districts indicate that the change in structure will increase the total costs to the citizens of Chambers County. For example, special education costs not reimbursed from state or federal sources will be more than $125,000 higher than under the current arrangement. CC–Ex 4, at 30–31 [charts]; 7 Tr. 48–51 [Riley].

The surviving Chambers County district would be required to contribute a share of local funds for special education that significantly exceeds the proportion of all current students whom it would enroll if Valley is permitted to operate: 46% of all current pupils will remain in the county system but that system will bear 57% of total local costs for special education. *Id.*

Similarly, Riley estimated the cost of school bus transportation in the event of a split of the two districts, based upon each system's operating its own fleet,[10] and taking

---

**8.** Despite not having examined the facts, Dr. Hall expressed the opinion that the quality of education in Chambers County would continue to improve under current leadership even after Valley withdrew. 2 Tr. 38 [Hall].

**9.** Excluded from these calculations were expenditures for special programs funded from categorical aid sources, including Chapter 1 and Chapter 2, CNP [child nutrition programs], vocational, adult, adult basic and community education. 8 Tr. 51–52 [Riley].

**10.** Riley assumed that the surviving county district would reimburse Valley for the cost of transporting students in grades 1–6 to Huguley Elementary School. CC–Ex 4, at 3; 7 Tr. 64, 75 [Riley].

account of school transportation reimbursement formulas used by the State Department of Education. Neither additional personnel, capital outlays, depreciation, or maintenance facility costs were included in his estimates, but only driver and maintenance personnel salaries, fuel costs and parts, maintenance and administrative costs. Although the total of these operating costs in the two systems is about the same as current operating charges, once again the surviving Chambers County system would bear a significantly larger share of unreimbursed costs which it would have to raise from local funds—67% of the total local funds needed for this purpose. CC–Ex 4, at 3, 10, 52–53; 7 Tr. 52–66 [Riley].[11]

Riley estimated total General Fund expenditures in the two systems at $5,971,315 for the surviving Chambers County district and $6,417,559 for Valley.[12] The surviving county district's share of this total (48%) exceeds the proportion of current students whom it will continue to enroll (46%). CC–Ex 4, at 4; 7 Tr. 92–93 [Riley].[13]

Valley does not challenge the accuracy of Riley's transcription of most costs presently being incurred by the school system, or the hypothetical allocation of those costs between the proposed Valley district and the surviving Chambers County system. It does suggest that some costs for the county system could be reduced by establishing cooperative programs with Valley or by modifying current practices. E.g., 7 Tr. 141–43 [Riley (joint transportation system)]; 8 Tr. 54–56 [Riley (possible changes in state requirements for special education)]. Of course, such changes could also reduce Valley's share of overall costs.

The court finds that Riley's estimation of actual costs to maintain current educational programs for all children in Chambers County (exclusive of Lanett), in the event that a separate Valley district were created, is sufficiently accurate and presents a reasonable portrayal of the impact upon expenditures of creating a separate Valley district.

*Revenues*

Anticipated expenditures are, of course, only a part of the picture. The parties addressed, and the court must consider, the extent to which each system will be able to raise adequate local revenues to meet projected costs.

In order to do so, and to understand the parties' contentions on this subject, it is necessary to describe the sources of local revenue available to school systems in Alabama, applicable limitations upon their use, and the procedures by which school districts may obtain access to them.

### 1. Ad valorem taxes

The earliest method of raising local revenues to support public education in Alabama was the *ad valorem* property tax. The Alabama Constitution of 1901 authorized a one-mill county-wide levy upon approval by a three-fifths majority in a referendum. Ala. Const. art. XIV, § 269.

Prior to 1956 the Constitution required that the proceeds of this one-mill tax be apportioned among school districts in the county so as to equalize the length of school terms throughout the county. While that language was removed by Amendment 111, by that time the Legislature had required that funds raised by the one-mill levy be distributed among all districts in the county in the same manner as state public school aid. Ala. School Code of 1927, § 259, *currently codified at* Ala.Code § 16–13–166.

In 1916 the Constitution was amended to authorize an additional three-mill county-

---

11. A number of witnesses testified that transportation costs would be much higher in a sparsely populated rural area like the surviving Chambers County district than in an urban area such as Valley. 3–A Tr. 39–40 [McClain]; 7 Tr. 62 [Riley]; 10 Tr. 43 [Winecoff].

12. The total of these amounts is slightly less than the total budgeted for the existing system in 1992–93. See CC–Ex 4, at 4. However, that figure included a one-time carryover of $404,661 that was used to repay short-term debt during the school year. 7 Tr. 73–74, 93, 8 Tr. 56–58 [Riley].

13. Working with Riley and the central office staff, the United States' expert witness Dr. Larry Leslie analyzed expenditures projected for the two systems in a slightly different format, excluding certain (mostly federal tax and teacher retirement) expenditures and revenues; he also calculated that the surviving county system would bear about 48% of the total costs of operating the two districts. US–Ex 44, at 8, 9.

wide levy for school purposes, and a three-mill "district" tax for schools, upon approval by the electors. Ala. Const. amend. 3 §§ 1, 2.

Funds raised from the three-mill county-wide levy authorized by Amendment 3 are treated, for purposes of calculating state aid, as apportioned among all school districts in the county on the same basis as the one-mill tax and are accordingly distributed on that basis. Ala.Code § 16–13–34(1)b.2.; 6 Tr. 233–34 [Riley].

Funds raised from the "district" *ad valorem* property levies must be expended for educational purposes within the respective districts in which they are raised. Ala. Const. amend. 3 § 3; Ala.Code § 16–13–198; 5 Tr. 13 [A. Leak].

In 1919 the Alabama Legislature authorized county boards of education to establish school tax districts for the purpose of levying the district tax authorized by Amendment 3. Ala. School Code of 1919, art. 12 § 4, *currently codified at* Ala.Code § 16–13–191.

Independent city school districts constitute separate "school tax districts." Ala.Code § 16–13–193.

In 1962, another amendment authorized an additional five-mill county-wide levy upon request of a local board of education to the governing body of a county and approval by the electorate in a referendum. Ala. Const. amend. 202.[14]

Finally, an additional three-mill "district" tax was authorized (upon voter approval) in 1980. Ala. Const. amend. 382.

Taken together, these Alabama constitutional provisions permit the voters to impose a total of 15 mills of *ad valorem* property taxation for the support of local public schools: up to 12 mills on a county-wide basis and up to 6 mills in each "school tax district."[15]

In the 1960's, Chambers County levied the maximum millages then authorized by the Alabama Constitution: four mills county-wide, three mills in each taxing district, and an additional five mills county-wide, ear-marked for capital outlays. P–Ex 30a.

The voters defeated referenda to renew the five-mill county-wide levy in 1969 and 1974, and it has not been placed on the ballot since that time. *Id.;* P–Ex 29, 30; 8 Tr. 219–20 [Riley]; V–Ex 57, at 1–2.

The 1980 authorization for an additional three-mill district tax levy has never been implemented within Chambers County. *See* 4 Tr. 11 [A. Leak: no efforts to increase millages within past fifteen years].

At the present time, therefore, the local millages authorized by the Alabama Constitution to be levied for school purposes (upon approval by the electorate) that are not currently being collected in Chambers County (and which are thus potentially available, should Valley separate from Chambers County) are the five-mill county-wide levy authorized by Ala. Const. amend. 202 and the three-mill district tax authorized by Ala. Const. amend. 382.

The only mechanism available to levy more than the total fifteen mills for school purposes prior to 1978 was to secure both authorization for an increased levy through a constitutional amendment (which required approval by the legislature *and* in a statewide vote, *see* Ala. Const. art. XVII, § 284, *as*

---

**14.** The proceeds from this county-wide tax are subject to apportionment on the same basis as the one-mill and three-mill levies. Ala.Code § 16–13–34(1)b.2.

**15.** In 1978 Ala.Const. amend. 373, known as the "lid bill," became effective. The lid bill established a new maximum millage for all state or local purposes based upon the "fair and reasonable market value" of property. Ala.Const. art. XI, § 217(i), as amended by Ala.Const. amend. 373.

It also imposed uniform assessment ratios and required reassessment of property throughout the state. Recognizing that reassessment might result in unexpected lower revenues for govern-

mental units, the amendment permitted taxing authorities (acting pursuant to criteria to be established by the legislature) to adjust millages within the first two years after its effective date so as to produce revenues amounting to no more than 120% of revenues from the previous millage in the 1977–78 tax year. *Id.* at 217(e).

Pursuant to this authorization, effective in 1979 in Chambers County, the previous four-mill county-wide school tax was raised to 6.6 mills, and the three-mill district school tax was raised to 4.1 mills. *See* P–Ex. 29. Therefore, the 4.1 mill "district" tax currently levied (and referred to extensively in the testimony) is the same as the three-mill "district" tax authorized by Ala.Const. amend. 3.

*amended by* Ala. Const. amend. 24) and also local voter approval for the levy. *See, e.g.,* Ala. Const. amend. 67.

The "lid bill" and Ala. Const. amend. 425 make it possible to exceed the ceilings on school or total millages without a statewide vote. Ala. Const. art. XI, § 217(f), as amended by Ala. Const. amend. 373; Ala. Const. amend. 425.

### 2. Sales taxes

Local municipalities in Alabama (incorporated cities and towns) have long had authority to levy excise, license, and similar taxes. *See Ex parte Bozeman,* 183 Ala. 91, 63 So. 201, 208 (1913) (Mayfield, J., dissenting).

A gross receipts (or sales) tax "is not 'a property or income tax, but an occupation or privilege tax,' " *Capital City Water Company v. Board of Revenue,* 117 Ala. 303, 23 So. 970, 973 (1897).

The general authority of municipalities in Alabama to levy sales taxes has at least since 1969 been confirmed by statute, *see* Ala.Code § 11–51–200.

The authority of county governing bodies in Alabama to impose license or privilege taxes is more narrow and is dependent upon specific legislative authorization. *See Opinion of the Justices,* 291 Ala. 262, 280 So.2d 97, 101 (1973) (describing history of local road laws authorizing license or privilege taxation), *citing Standard Oil Company of Kentucky v. Limestone County,* 220 Ala. 231, 124 So. 523, 526 (1929); *Standard Oil,* 124 So. at 527 (noting existence of general law authorizing counties to levy privilege tax only on vehicles).

In 1969 the Legislature first authorized county governing bodies to levy sales taxes for educational purposes. *See Opinion of the Justices,* 291 Ala. 262, 280 So.2d 97 (1973).

The portion of the 1969 Act upheld in *Opinion of the Justices* is found at Ala.Code § 40–12–4. It empowers the county board to levy a sales tax to support schools, or to submit the matter to the electorate. *Id.* at § 4(a). It further requires that, like the county-wide *ad valorem* millages, revenues from any such sales tax be allocated among all school systems in the county on the same basis as state aid. *Id.* at § 4(b).[16]

Finally—but significantly—while cities and towns may levy their own sales taxes, the Alabama Supreme Court has held that the state's Constitution prevents the Legislature from authorizing the collection of a sales tax for educational purposes within the territory of a county *not including incorporated municipalities operating their own school systems. Opinion of the Justices,* 469 So.2d 105, 108 (Ala.1985).

### 3. Other local revenue sources

School systems also receive modest local revenues from an alcoholic beverage tax (the "beer tax") and a mobile home tax. V–Ex 1–A, at 17; 4 Tr. 23 [A. Leak].

### 4. Impact

With this background, the Court proceeds to evaluate the parties' contentions about what revenues would be available to the Valley district and to the surviving Chambers County system to meet the projected expenditures required to operate their schools, both immediately upon formation of the separate districts and in the future.

In preparing Chambers County Board's exhibit estimating the cost of maintaining current levels of service and program in each district, Riley apportioned the various categories of state aid funds to the two systems based on applicable formulas and criteria. 7 Tr. 67–69 [Riley].

All of the local revenue sources identified in the preceding discussion are apportioned among school districts in Chambers County in the same fashion as state minimum program aid with the exception of the original three-mill (now 4.1 mill) district *ad valorem* property tax. Riley explained the basis for that apportionment, known as the "current expense ratio," in considerable detail. 7 Tr. 36–46 [Riley].

The dominant, although not exclusive, factor in the calculation of the "current expense ratio" is a school system's average daily student attendance (ADA); for this reason, it is commonly said that most state and local

---

**16.** *It is pursuant to this legislative authorization* that the one-cent sales tax to which reference has previously been made was levied in Chambers County.

funds are distributed based on ADA or "follow the child." 3–A Tr. 17–18 [McClain]; 7 Tr. 42 [Riley].

In estimating the local revenues likely to be available to each of the successor school systems if the Court permits the formation of Valley, therefore, the "current expense ratio" or other appropriate formula is simply applied to each local revenue source other than the 4.1 mill district tax. Riley utilized this procedure in making his projections, dealing separately with revenues not subject to formula allocation. 7 Tr. 67–77 [Riley]; CC–Ex 4, at 1–2.

Exclusive of the district 4.1 mill tax, Riley's calculations indicate that the surviving Chambers County district would receive 46% of other local revenues, consistent with the notion that most funding is allocated on an ADA basis. CC–Ex 4, at 1–2.

Allocation of the district *ad valorem* tax revenue is a more complicated matter and was the subject of considerable attention and disagreement at trial.

There are presently three tax districts in Chambers county. CC–Ex. 5; 6 Tr. 235 [Riley]; 8 Tr. 65 [Riley].

School tax district # 3 is coterminous with the City of Lannett, an independent school system.[17] 6 Tr. 238 [Riley].

School tax district # 1 is roughly coterminous with the boundaries of the Valley High School attendance zone. 6 Tr. 236–37 [Riley].

School tax district # 2 includes the remainder of Chambers County. 6 Tr. 238 [Riley].

There is industrial park property within Chambers County that is exempt from city taxation: the owners of businesses and factories in these parks (even if the industrial parks are surrounded on all sides by an incorporated city such as Valley) are required to provide their own fire and police, sanitation and other services and are not considered to be a part of the city. *See* Ala.Code § 11–23–6; 8 Tr. 70 [Riley].

There appears to be no Alabama statute, regulation, Attorney General's opinion, etc.

explicitly dealing with the question whether a separate school taxing district created when an independent city system is formed will or will not include industrial park property surrounded physically by the city but not legally part of the territory of the city. The matter assumes significance in this case because there is such an industrial park inside the Valley city limits which includes West Point Pepperell property of considerable assessed valuation; there are also two separate such properties now surrounded by Lanett as a result of the West Shawmut and Plant City annexations. *E.g.*, 8 Tr. 75, 90–91 [Riley].

Valley takes the position that those industrial park properties physically within its boundaries do not become part of the new tax district which will be created once it begins to operate its school system, but rather will remain within current tax District # 2 (the surviving Chambers County system). 8 Tr. 83–84 [stipulation by counsel for Valley].

Lanett, however, takes the position that the industrial park properties which it now surrounds as a result of the annexations should be included within tax district # 3. 8 Tr. 89 [statement of counsel for Lanett].

Riley testified that he was advised by the Alabama Department of Revenue that such industrial park properties would become a part of the "city system" tax district (the "Lanett position"). 8 Tr. 70–71, 79, 268–72 [Riley].

In allocating revenue from the 4.1 mill district tax for purposes of his cost estimate, Riley assumed that the industrial properties would become a part of the new Valley taxing district and District # 3 [Lanett], respectively. 6 Tr. 242, 7 Tr. 72–73 [Riley].

Additionally, in making his estimate, Riley divided the 4.1 mill tax revenues that would be generated within what will remain of present tax district # 1 after a Valley system's formation (that is, roughly, the area of the Valley High attendance zone outside the city limits) between the two districts based upon ADA, since all pupils in grades 7–12 in that area would attend schools in the Valley sys-

---

17. The tax district *should* be coextensive with the city's boundaries by operation of law. *See* Ala. Code § 16–13–193 (city need not furnish new tax map). It appears from the testimony in this

case, however, that district tax revenues from areas annexed to Lanett in recent years are not yet being paid over to Lanett. 7 Tr. 242, 8 Tr. 91, 272 [Riley].

tem. 7 Tr. 111 [Riley]; *cf.* Ala.Code § 16–13–198 (where no school within tax district, district tax funds may be used to transport pupils to school in other tax district).

For purposes of his cost estimates, Riley utilized information concerning assessed valuation of taxable property in Chambers County furnished by the county Tax commissioner, Bill Gilbert, at the request of Arnold Leak. 6 Tr. 245–46 [Riley]. This information was admitted only to show the basis for the estimates made by Leak and Riley; its accuracy was not conceded. 4 Tr. 6–7.

Subject to all of those assumptions and understandings, Riley allocated anticipated revenues from the 4.1 mill tax among the three systems (Lanett, Valley and Chambers County) and calculated the net balance of revenues and expenditures for the county district and for Valley. He estimated a Chambers County operating deficit of $446,-628 and a small Valley operating surplus of $18,615. CC–Ex 4, at 4; 7 Tr. 99 [Riley].

After the exhibit showing these calculations, CC–Ex 4, was prepared, the Tax Commissioner furnished updated assessed valuation information. CC–Ex 19; 7 Tr. 103–04 [Riley].

Based upon this new information, Riley testified that the net of revenues and expenditures necessary to maintain the existing educational program in both systems would change by reducing the projected Chambers County system deficit by $19,637 to $426,991 and reducing the projected Valley surplus by the same amount—which would produce an operating deficit of approximately $1,022 for Valley. 7 Tr. 114 [Riley]; see CC–Ex 4, at 4.

If the proceeds of the 4.1 mill district tax on the West Point Pepperell properties are received by the Chambers County district rather than by Valley, as Valley stipulated at trial, the county system's projected deficit would be reduced, and that of the Valley system increased, by $85,197. CC–Ex 19; 7 Tr. 115–16 [Riley].[18]

Even accepting Valley's stipulation as to the distribution of the district tax on West Point Pepperell properties, therefore, the surviving Chambers County system can anticipate commencing its existence facing an operating deficit of nearly $350,000 [19] at current taxing levels, and Valley itself will have an $86,000 shortfall.[20]

The court concludes that Riley's revenue estimates, like his expenditure tallies, are reliable indications of the financial situation in which both Valley and the surviving Chambers County school system are likely to find themselves if Valley creates an independent district.

The projected deficits would be substantially increased if there were any proration of state aid. *See* 3–A Tr. 69–70, 76–77 [McClain].

As the court has previously noted, Alabama law prohibits school systems from operating at a deficit and penalizes them for doing so. Thus, it is clear that in order to maintain the current level of offerings—to say nothing of making the improvements in both systems that all witnesses agreed were desirable—additional local revenues for public education will need to be raised in both Valley and in the surviving Chambers County system.

5. *Potential for future revenue increases*

As indicated in the previous discussion, there is only one source of additional local revenue that could be levied and collected

18. The new figures would be: Valley, deficit of $86,219; county, deficit of $341,794. As previously noted, Lanett did not agree that industrial park properties which it now surrounds would be excluded from its taxing district. These properties are valued at approximately $9.5 million and would produce a 4.1 mill tax revenue of about $39,000. *See* 7 Tr. 114–15, 8 Tr. 238 [Riley].

19. It should be noted that Valley explicitly declined, at trial, to waive any right it may have to receive a *pro rata* (ADA) split of district tax funds from the balance of existing District # 1—the

area within which students residing outside the city limits will attend city schools. 8 Tr. 87–89. Of the $85,991 in revenues generated by application of the 4.1 mill tax in this area, 56%, or $48,078 would go to Valley, and 44%, or $37,914 would go to the county system.

20. These figures are subject to some additional reduction in light of the fact that pursuant to the 1993 Agreed Order, the Chambers County High School facility has been closed. Utility costs at that school were particularly large. *See* 9 Tr. 140 [Leslie].

solely within the boundaries of the surviving Chambers County district: the district property tax; all other taxes are subject to county-wide collection and apportionment and, with the exception of the county-wide sales tax for educational purposes, would require an affirmative vote in the entire county for their imposition.

As further previously found by the court, there remains only three mills of unused district tax millage authorized by the Constitution which the voters of the surviving Chambers County district could authorize to be levied (without securing a local constitutional amendment pursuant to Ala.Const. amend. 425 or securing the endorsement of the County Commission and obtaining the approval of the legislature pursuant to Ala. Const. art. XI, § 217(f), as amended by Ala. Const. amend. 373).

Most of the witnesses who testified at the trial agreed that it is extremely difficult to persuade voters to pass any property tax increase today, and that it was likely to be difficult to raise revenue in a predominantly minority school district such as the surviving Chambers County system would be. See 3–A Tr. 54 [McClain: experience of school districts in Alabama within past five years in obtaining millage increases not good]; 4 Tr. 14 [A. Leak: .sales taxes easier to pass than property levy]; 7 Tr. 32–33 [Riley: residents of area outside Valley city limits whose children would go to Valley schools in grades 7–12 less likely to support tax increase for county schools]; 9 Tr. 125, 171–72 [Leslie: harder to raise support for heavily minority school system and nationwide pattern indicates difficulty of raising property taxes in general]; 11 Tr. 58 [Bryan: difficult to raise revenues for a 70%–black system].

Based on the revised assessment figures provided by Gilbert, it is possible to calculate how much would currently be raised for a surviving Chambers County school system by an additional three mill district tax applied to property within its boundaries, and including the West Point Pepperell industrial park properties physically located in Valley: $182,619.[21]

Even if the additional three mill district tax authorized by the Constitution were levied within the surviving Chambers County system, therefore, immediately upon its formation there would still be an anticipated operating deficit of approximately $150,000.

The court finds, based upon a consideration of all of the evidence and testimony on this subject, that, if a separate Valley system is authorized, additional district taxes are unlikely to be a reliable and substantial source of additional revenues for a surviving Chambers County school district in the foreseeable future.

Valley has also suggested that additional county-wide taxes could be levied—either property or sales taxes—to raise revenue for the county system. (The proceeds of such taxes would, of course, be allocated among the Lanett, Valley and Chambers County systems based on the "current expense ratio" or ADA.) *E.g.*, 3–B Tr. 248 [A. Leak: possible half-cent sales tax]; 4 Tr. 15 [A. Leak: County Commissioner Doss Leak would support request for increased sales tax by Chambers County School Board if separate systems formed].

There was no evidence to indicate that county-wide property tax increases would be any more likely to succeed in winning the support of the electorate than district taxes. See, *e.g.*, 3–A Tr. 54 [McClain: poor record of passing increases in state in last five years]; 2 Tr. 101–03 [Hall: Huguley parents who send their children to Valley for grades 7–12 would be unlikely to support county-wide property tax increase].

Although Alabama law provides that the County Commission may, but need not, condition a sales tax increase on an affirmative

---

21. The base against which the tax would be levied consists of the total $30,988,530 assessed valuation of current tax district #2 [Chambers County outside of Lanett and the Valley attendance area], plus the $20,973,610 assessed valuation of West Point Pepperell industrial park properties except those claimed by the City of Lanett, plus 44% of the $20,252,280 corrected as-sessed valuation of tax district #1 outside the city limits of Valley (the total $29,718,480 valuation corrected by deducting the valuation of the two West Point Pepperell properties claimed by Lannett that are currently included within District #1), or $60,873,143. See CC-Ex 19; 7 Tr. 109–11 [Riley]. A three-mill tax on that valuation yields $182,619.

vote of the people, Ala.Code § 40–12–4, a realistic assessment is that rarely will elected officials raise constituents' tax bills without seeking their approval. Of the sales taxes for school purposes that have been levied in Chambers County, only the initial one-cent, one-year tax in 1979 was enacted without a popular vote. See V–Ex 57 [Doss Leak report to County Commission, at 1–2]; V–Ex 73 [Milner deposition, at 511–13, 566]. Even the one-year, one-cent earmarked capital outlay levy in 1992 was submitted to a vote. See V–Ex 1–A, at 7–8.

Unlike the County Commission, the Valley City Council's authority to levy a sales tax is not linked to even a discretionary vote of the people. Ala.Code § 11–51–200. Valley's own expert witness, Dr. Floyd Hall, recognized that city school systems have more authority and opportunity to raise revenue than rural systems. 2 Tr. 100–01 [Hall].

Dr. Wayne Teague, Alabama State Superintendent of Education, testified that cities have a much greater potential for raising revenues for their schools than rural county systems. 3–B Tr. 162 [Teague].

Valley emphasizes the strong electoral support from its residents for the 1992 county-wide one-year one-cent sales tax earmarked for capital outlay. 4 Tr. 12–14 [A. Leak]; V–Ex 1–A, at 7–10. However, the majority of those funds were earmarked to make capital improvements at schools located within Valley, 5 Tr. 159 [A. Leak].

When that tax increase was voted, there was no separate Valley school system within which a separate district millage or local sales tax could be levied. Valley makes no commitment to forego the use of separate taxes to finance its own school system, although it recognizes that if a city tax is levied, Valley's voters will be less likely to support county-wide millage or sales tax increases. 11 Tr. 237 [A. Leak].[22]

Indeed, Valley has been careful to protect its opportunity to levy local taxes. For example, its draft agreement prepared for anticipated negotiations with the Chambers County School Board reserved the right to charge tuition to non-city residents who

would be in the Valley system's proposed attendance area, if a local school tax in Valley were levied. 1 Tr. 188–90 [Fuller].

Valley expects to have to raise taxes in order to improve the quality of education in its school system, which it desires to do. 5 Tr. 12 [A. Leak].

Although county residents who shop in Valley would pay a city sales tax, Valley is not willing to apportion revenues from a city sales tax for education between its system and the county system. 5 Tr. 136 [A. Leak].

As Dr. Teague put it, "virtually every time you have a city school system formed, they want to keep the revenues in the city for their youngsters." Asked whether he would expect a city system that was being created explicitly for the purpose of increasing the level of financial support for the schools to share revenue with the county district from which it was formed, he responded: "No, if they did, they wouldn't split off to start with." 3–B Tr. 165–66 [Teague].

As previously noted, the Alabama State Board of Education has in fact, passed a resolution supporting consolidation of school districts, not the formation of new systems. CC–Ex 10.

Finally, the court heard a great deal of testimony about the relative level of retail sales activity within the City of Valley and in the Chambers County area outside Valley and Lanett. Evidence purporting to quantify that activity, whose accuracy and significance were challenged, was excluded on other bases. In any event, the court finds that the evidence would have little probative value on the material issues in this case. Arnold Leak was permitted to state his opinion that

the sales tax areas, including the city of Lafayette, which uses county schools, is greater than either the gross sales in the city of Lanett or the gross sales in the city of Valley.

Now, if you added the gross sales of Lanett to the gross sales of Valley, it would be greater than the county. But that is not the taxes collected and spent for

---

22. This point was reiterated by other witnesses. *E.g.*, 11 Tr. 59 [Bryan: Lanett voters more likely to support local tax measure than tax whose proceeds would be split with Chambers county system]; 9 Tr. 74, 82–83 [Fannings]; 9 Tr. 126–27 [Leslie].

schools. The county has ... The county, taking the total, has more gross sales than either the city of Lanett or the city of Lafayette.

4 Tr. 9 [Leak]. Even if Leak's opinions are correct, it is of no assistance to the surviving Chambers County school system in terms of enhancing its ability to raise revenues. *All* proceeds from a county-wide sales tax, no matter in what area they are generated, will be divided among the Lanett, Valley, and Chambers County school systems, with Valley receiving the predominant share (56%) of revenues remaining after Lanett's portion is distributed.[23] And, of course, even if Leak's opinions are correct, it is not possible for the county system to take advantage of the situation by levying a sales tax *only* within its boundaries. *Opinion of the Justices,* 469 So.2d 105 (Ala.1985).[24]

Dr. Teague testified that "[i]n practically all cases," formation of a new city system threatens the viability of the remaining rural district because cities have so much greater revenue-producing wealth. 3–B Tr. 160–61 [Teague]. For this reason, he recommends that Alabama statutes should be changed to require guarantees of equity for the remaining rural district before formation of a city system is permitted. *Id.* at 177.

Valley officials have made no attempt to provide such a guarantee for the more rural portion of the Chambers County School District from which Valley wishes to separate. Mr. Fuller, for example, thought there would be no adverse impact "because of the fact that there would still be minimally funded by the state, as we would be." 1 Tr. 171 [Fuller]. Compare Dr. Teague's characterization that "you can't have an adequate education system in a minimum program." 3–B Tr. 209 [Teague]. Mayor Crowder, for another example, never looked at the level of revenues that would be available to Valley com-

pared with the rest of the county. 1 Tr. 228 [Crowder].

The court finds that allowing Valley's formation and operation of a separate system at this time will disrupt and impede progress toward the complete eradication of the lingering vestiges of the dual school system in Chambers County; that it will also increase the overall costs of providing even a minimal level of educational services to the children of Chambers County, including in the City of Valley; that it will promote unnecessary duplication and prevent educationally sound and fiscally prudent consolidation of programs and schools; and that it will result in the creation of a small, rural, heavily black school system enrolling a large majority of needy pupils from impoverished families, with the ability of that district to raise adequate local revenues to address these problems and deliver a high-quality education severely restricted, if not nonexistent.

*Practicability*

The court must also consider whether Valley's proposal introduces a level of complexity to the desegregation process in Chambers County that is so great that it will itself be an impediment to the speedy and effective elimination of the remaining vestiges of the dual school system.

Valley takes the position that the ongoing desegregation process in the Chambers County school district will not be affected adversely by its establishment and independent operation as a separate system because any issues that may arise can be negotiated between the school systems, resolved by the State Superintendent of Education, or be determined by this court.

Consistent with this approach, Valley has left a host of operational questions, such as the division of tangible resources (for exam-

23. It may well be that if Leak is correct, sales taxes paid on a county-wide basis result in county area sales subsidizing Valley area schools.

24. It was also suggested that any financing difficulties which are anticipated in the surviving Chambers County school district will be taken care of by the remedy in the "equity funding" suit decided in the state court system. *Alabama Coalition for Equity, Inc., et al. v. Hunt, et al.,* CV–90–883–R, 1993 WL 204083, Circuit Court of

Montgomery County, Alabama. It suffices to say that if and when a remedy is devised and implemented in that litigation and its effect on the Chambers County school district can be gauged, the parties will be free to return to this Court to seek modification of its Orders. *Cf.* 3–A Tr. 78 [McClain: he would not suggest that Valley postpone its efforts to establish a separate system until the outcome of the equity funding suit is known].

ple, equipment, supplies and buses), assumption of existing capital indebtedness, to name just a few, for future determination.

Thus, at a time when Chambers County school authorities should be devoting their energies and attention to implementing the recent Orders of this court and to devising and implementing the comprehensive blueprint for final constitutional compliance as agreed by the parties and that is required by the 1993 Agreed Order, if operation of a Valley district were permitted, they would instead be enmeshed in negotiations, state administrative proceedings, and possible further appearances before this court to resolve disputed matters.[25]

The court finds that it would be at least optimistic and probably unwise to assume that separate Valley and Chambers County school systems will be able to settle any problems between them through negotiation and cooperation. Riley, for example, pointed to the example of Lanett's failure to participate in the area vocational center, and Dr. Winecoff agreed that, historically, cooperative agreements between school districts had been difficult to administer. 7 Tr. 128 [Riley]; 10 Tr. 41–42 [Winecoff].

The Chambers County Board of Education currently is taking steps to address continuing curricular inequities throughout the school district; to achieve an equitable balance at each school of faculty and staff, both racially and with respect to teacher qualifications; to monitor inter- and intra-district transfers to guard against transfers that adversely affect desegregation in either the sending or the receiving school; to address historic inequities in the relative quality of facilities throughout the district; to revamp its transportation system so as to eliminate and prevent the recurrence of racially segregated bus routes; to desegregate the staff of the central administrative office; and, generally, to improve the quality of education for the children of Chambers County.

If the City of Valley is permitted to operate a separate and independent system, these efforts—and the progress of the Chambers County public schools toward unitary status—will become far more complex.

For example, each teacher assignment decision presently is affected by current assignments throughout the existing Chambers County school district. To the extent that full constitutional compliance has not been attained—and it currently has not been attained—at the time a separate Valley district begins operations, both school systems will share in the responsibility for achieving the original goal of having racially non-identifiable faculties among all of the schools that either operates. If the districts operate independently, however, ensuring the realization of this goal will inevitably cause friction and ultimately involve this court in a level of detailed supervision and administration of local schools that would be unwieldy and unwise. See 8 Tr. 254–57 [Riley].

The court already can identify a major conflict between the two systems that it would have to adjudicate: the Chambers County Board of Education's proposal to develop a single, comprehensive high school for the entire county. The United States and the private Plaintiffs support this proposal because of its desegregative and educational benefits; the Valley City Board of Education is adamantly opposed. Because the current Chambers County district has not achieved unitary status, even if the court permits operation of a Valley system, the issue of a consolidated high school will have to be resolved by the court. And if the court determined that the consolidated high school should be implemented, it would have to determine difficult and intricate issues of fiscal responsibility and day-to-day administration and the parties would have to cope with those complexities.

Moreover, as the court indicated in the *Introduction* to its Findings, Valley's proposal raises a number of important and complicated questions concerning voting rights on which Valley has taken no position other than

---

**25.** Although the State Superintendent of Education has final, binding authority to decide disputes under state law, Ala.Code § 16–4–8; 3–B Tr. 189–90 [Teague], this court has the responsibility to ensure that federal Constitutional requirements, which are supreme, are carried out.

It thus would be necessary to permit a party dissatisfied with a decision by Dr. Teague the opportunity to demonstrate to this court that it has a viable constitutional claim requiring that the state decision be superseded.

to ask this court to decide them: whether citizens of the City of Valley should vote in elections for members of the Chambers County Board of Education or the Chambers County Superintendent of Schools (so long as that position remains an elective one); and whether parents residing outside of the city limits of Valley whose children would be assigned, under Valley's proposal, to attend schools operated by the Valley City Board of Education, should have any opportunity to participate in the governance of those schools. (Currently, the Valley City Board of Education is appointed by the Valley City Council, which is elected by the citizens of Valley. 4 Tr. 132–34 [A. Leak]; P–Ex 9.) The answers to these questions could add layers of complexity in governance to the complexities of administration that will result from implementing a separate Valley school district at this time.

The court finds that the introduction of an independent decisionmaking body (a new school district) in the midst of the desegregation process in Chambers County will greatly complicate planning and implementation of measures necessary for constitutional compliance, will increase the potential for conflict, will be likely to involve this court in an unnecessarily detailed level of supervision and administration (thus displacing local control), and ultimately will impede the County's progress toward a unitary system from which all vestiges of past discrimination have been eliminated.

### III.  Conclusions of Law

■   The City of Valley undeniably has not only a right, but an obligation, under state statute to control and operate the schools within its boundaries unless it enters into an agreement with the Chambers County Board of Education for its schools to remain under control of the county board. § 16–13–199, *Code of Alabama* (1975) ("If the municipality does not enter into such an agreement, the control of the school or schools of the territory within the municipality shall be vested in a city board of education. . . .")

The problem arises when the rights and obligations created by this statute come in conflict with an existing court order requiring the county school system, of which Valley is a part, to eliminate all vestiges of the dual school system which previously had existed in the county pursuant to state law.

■   Unlike the City of Lanett, which has had its own city school system for over a century, Valley was created as a separate municipality at a time when its county was already under such a court order. Thus, a Valley school system would be what has been referred to in court cases dealing with similar facts as a "splinter school district." This is a system which has split off from another system (parent) which is operating under an existing desegregation order.

Over 20 years ago, the Supreme Court firmly established the test which must be applied in situations such as this:

> We have today held that any attempt by state or local officials to carve out a new school district from an existing district that is in the process of dismantling a dual school system "must be judged according to whether it hinders or furthers the process of school desegregation. If the proposal would impede the dismantling of a dual system, then a district court, in the exercise of its remedial discretion, may enjoin it from being carried out."

*United States v. Scotland Neck Bd. of Educ.*, 407 U.S. 484, 489, 92 S.Ct. 2214, 2217, 33 L.Ed.2d 75 (1972) (citing *Wright v. Council of City of Emporia*, 407 U.S. 451, 460, 92 S.Ct. 2196, 2202, 33 L.Ed.2d 51 (1972)).

In *Wright v. Council of City of Emporia*, the city which wished to form and operate a splinter school district made much the same argument as that of Valley here:

> . . . Emporia advances arguments that a separate system is necessary to achieve quality education for city residents, and that it is unfair in any event to force the city to continue to send its children to schools over which the city, because of the character of its arrangement with the county, has very little control.

*Id.* at 467, 92 S.Ct. at 2205.

The Supreme Court's answer to that argument must guide the court in its decision in the case at bar:

> The District Court, with its responsibility to provide an effective remedy for segregation in the entire city-county system, could

not properly allow the city to make its part of that system more attractive where such a result would be accomplished at the expense of the children remaining in the county.

*Id.* at 468, 92 S.Ct. at 2206.

The year before, the Fifth Circuit had dealt with the issue of a splinter school district in a case involving Alabama splinters (Pleasant Grove, Vestavia, Midfield and Homewood) withdrawing from their parent (Jefferson County). *Stout v. Jefferson County Board of Ed.,* 448 F.2d 403 (5th Cir., 1971) ("Stout I")[26] The court held:

> ... [W]here the formulation of splinter school districts, albeit validly created under state law, have the effect of thwarting the implementation of a unitary school system, the district court may not ... recognize their creation.

*Id.* at 404 (footnote omitted).

On remand, the district court ordered the splinter districts to accept a proper role in the desegregation of the county system. This was affirmed on appeal, *Stout v. Jefferson County Board of Education,* 466 F.2d 1213 (5th Cir.1972) ("Stout II"), *cert. denied, sub nom., Stripling v. Jefferson County Bd. of Educ.,* 410 U.S. 928, 93 S.Ct. 1361, 35 L.Ed.2d 589 (1973), with the Fifth Circuit holding that legally created splinter school districts could be disregarded if their existence thwarted implementation of a unitary school system in the county as a whole. The court went on to say that courts should not remove local control indefinitely and that sovereignty should be returned to a splinter district when the splinter demonstrates "by clear and convincing evidence" that it is able and intends to comply with the court's orders concerning its role in the desegregation of the county school district. *Id.* at 1215.

Valley argues that the latter holding in Stout II should cause this court to authorize it to operate a separate school system because it has pledged to the court that it would follow any order which the court might issue as to the role which the Valley district should play in assisting to complete desegregation of the schools in Chambers County.

Valley also emphasizes its commitment to operate an integrated system, even hopefully a "model" system, within its new district for the benefit of children of all races.

While the court accepts the sincerity of Valley's offer, accepts Valley's assurance that it intends to operate a fully integrated school system that would be eligible to be adjudged a unitary system if judged alone, and accepts Valley's commitment that it has no intention to impede the progress of desegregation in the county system, this begs the real issue. As the Supreme Court has stated, "[t]he existence of a permissible purpose cannot sustain any action that has an impermissible effect." *Wright,* 407 U.S. at 462, 92 S.Ct. at 2203. The issue here is not whether Valley could create a fully integrated unitary system for itself, or whether Valley is willing to accept a role in desegregating the county system. The basic issue before the court is whether a separate Valley system can be operated at this time, even accepting whatever role the court might assign it, in a way which does not impede the final dismantling of a dual school system in Chambers County.

In *Ross v. Houston Independent School District,* 559 F.2d 937 (5th Cir., 1977), the Fifth Circuit again considered the matter of splinter school districts and rejected a suggestion that a splinter district's acceptance of a proper role in the desegregation of the county system was sufficient under *Stout* to authorize its existence. The court said:

> The generality, "accept a proper role in ... desegregation ...," only epitomized the action taken by the district court in that case. It was not intended to define a new district's responsibilities. We expressly noted that the district court had in fact applied the substance of the *Emporia* and *Scotland Neck* cases and had looked at whether recognition of the new district would thwart implementation of a unitary system in the county as a whole. *See* n. 2 at 1215. We further noted that the approach taken by the district court looked at the entirety of the system subject to the court's order to determine what needed to

**26.** In *Bonner v. City of Pritchard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981.

be done to assure the achievement of a unitary system and then determined whether the creation of the separate system would interfere with the process of desegregation. (Referring to *Stout II*, 466 F.2d at 1214).

*Id.* at 944.

In discussing the factors which a district court is required to weigh under *Emporia* and *Scotland Neck*, the court made the following statement which is particularly applicable to the case at bar:

> (1) *changes in education quality*—if upgrading the quality of education for students in the new district would have a substantial adverse effect on the quality of education for students remaining in the old district, then operation should not be allowed.

*Id.* at 943–44 (emphasis added).

The court went on to point out that it is not sufficient for a splinter district merely to agree to accept a desegregation role. The splinter must "establish what its operations will be," and "must express its precise policy positions on each significant facet of school district operation." After doing so,

> the burden remains on [the splinter district] to establish that its implementation and operation will meet the tests outlined for permitting newly created districts to come into being for parts of districts already under an ongoing court desegregation order.

*Id.* at 945.

It is with these legal concepts and directions to the district courts in mind that this court has considered the facts as found from the evidence and made its conclusions of law.

The court has carefully considered Valley's proposals. Although it has expressed preferences, Valley has suggested several alternatives designed to address the various *Green* factors, all of which it is willing to accept. And, while the burden of proof is properly on Valley, the court has struggled with Valley's request that it "mandate a desegregation plan that incorporates, recognizes and accommodates the existence of and in turn operation of a city school system by the Valley City Board of Education." (Brief in Support of Amended Petition to Intervene on Behalf of the Valley City Board of Education and the City of Valley, Alabama.). The court has concluded that it cannot be done at this time.

While a fully integrated unitary school system could be created under Valley's control, the facts as found by the court lead inescapably to the conclusion that it cannot be permitted at this time, because it would impede the dissolution of the dual school system in the remainder of Chambers County.

As noted earlier in the court's Finding of Facts, there are several reasons that a Valley splinter school district would create an impediment. It would leave a predominately black county system, balanced somewhat only by attendance zones dependent on continuing court orders authorizing attendance at Valley schools by students from outside the city limits. This would in turn create a need for continuing supervision by the court in such matters as transportation, curriculum, etc. It would have a substantial adverse impact on the quality of education for students remaining in the old district.

The move to create a separate school system in Valley grew largely out of frustration over mismanagement and lack of effective leadership in the county system. Those conditions have now changed. With new leadership, the Chambers County Board of Education is now making great strides to create an educationally sound and financially strong school system for all the children of Chambers County, including those in Valley, and one which is moving toward the goal of achieving unitary status—a status which will allow the system to be removed from continuing supervision of the federal courts.

Among other efforts to which the County Board is committed is a plan to attempt to establish a new consolidated high school for all the county. While the evidence before the court indicates that this would greatly enhance the educational opportunities for the children of Chambers County, a consolidation of schools is always controversial, and it will require effective communication and persuasion on the part of the Board. Ultimately, the success of such a voluntary effort will depend on the people of Chambers County and whether they wish to support it. This is a decision which this court would like to see

the people have an opportunity to consider, an opportunity which would effectively be denied them if a separate Valley district were created now.

The court has earlier made findings of fact as to numerous ways in which a Valley district at this time would complicate the desegregation process in the county, even if the court treated the county and city districts as one for such purpose. Such complications would themselves impede the progress toward what must be the ultimate goal—declaration of a unitary system.

What we must all seek—the parties, the lawyers, and the court—is to finally remedy the constitutional violations created by the old state-imposed system of segregated schools to the end that the federal courts no longer have to supervise the operation of the public schools of Chambers County, not to adopt a patchwork approach which depends on continued court involvement to make it work.

It has never been the aim of the federal courts to assume permanent control over public schools, and neither should the courts allow that to happen. *The federal courts entered this area only to remedy the constitutional violations of a racially segregated school system. Once that is done, the courts will get out.* The Supreme Court made this original goal clear once again in the case of *Freeman v. Pitts*, —— U.S. ——, ——, 112 S.Ct. 1430, 1445, 118 L.Ed.2d 108 (1992) as follows:

> We have said that the court's end purpose must be to remedy the violation and in addition to restore state and local authorities to the control of a school system that is operating in compliance with the Constitution.... In [*Board of Education of Oklahoma City v.* ] *Dowell*, we emphasized that federal judicial supervision of local school systems was intended as a "temporary measure." 498 U.S. [237] at 247, 111 S.Ct. [630] at 636 [112 L.Ed.2d 715

(1991)]. Although this temporary measure has lasted decades, the ultimate objective has not changed—to return school districts to the control of local authorities.

The facts in this case impel the court to the inevitable conclusion that this ultimate objective for the Chambers County schools would be impeded by the operation of a Valley school system at this time. Accordingly, the court will deny Valley's request to operate as a separate school district.[27]

An order will be entered consistent with the findings contained herein.

---

27. The court notes that at this particular time in its history Chambers County is fortunate to have a number of leaders who are sincerely dedicated to improving public education for the children of the county. Its citizens would be doubly blessed if circumstances could now lead two of them, Leonard Riley and Arnold Leak, away from competition and toward cooperation and coordination of their talents, to the end of assuring that a school system of outstanding educational quality, unitary and devoid of past constitutional violations, could at last be achieved in Chambers County and the operations and control of the schools returned to local authorities. What a legacy they would leave.